TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental Crimes & Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
DANBEE C. KIM (Cal. Bar No. 350014)
Assistant United States Attorneys
Environmental Crimes & Consumer Protection Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-3359/8644/6530
    Facsimile:  (213) 894-1019
    Email:     mark.williams@usdoj.gov
              matthew.o'brien@usdoj.gov
              danbee.kim2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>JONATHAN RINDERKNECHT,<br>  aka "Jonathan Rinder,"<br>  aka "Jon Rinder,"<br><br>        Defendant. | No. CR 25-833-AH<br><br>GOVERNMENT'S MOTION IN LIMINE TO ADMIT EVIDENCE OF DEFENDANT'S MENTAL STATE; DECLARATION OF DANBEE C. KIM; EXHIBITS<br><br>**(REDACTED)**<br><br>Hearing Date:  May 13, 2026<br>Hearing Time:  10:00 a.m.<br>Location:     Courtroom of the Hon.<br>             Anne Hwang |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Mark A. Williams, Matthew W. O'Brien, and Danbee C. Kim, hereby moves this Court to admit evidence of defendant's mental state.

On April 7, 2026, the parties met and conferred for the final time regarding this motion and related issues.  (The government's Rule 404(b) notices are attached hereto as Exhibits A and B.)  Defense counsel informed the undersigned counsel that defendant opposes this motion.

This motion is based upon the attached memorandum of points and authorities and the exhibits thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 8, 2026     Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division


       /s/
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
DANBEE C. KIM
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND....................................................................................3

        A.      Defendant's History of ████████████████████ ......................3

        B.      Defendant's ChatGPT Communications....................................................5

        C.      Defendant's Support of Vigilantism and Anger at Billionaires...................8

        D.      Defendant's Use of Fire As a Tool for Cathartic Release and Threats........9

        E.      Defendant's Fascination with Wildfires and Emergency Responses ...........9

        F.      Defendant's Anger and Loneliness on New Year's Eve 2024...................10

        G.      Defendant's Mental State After the Lachman Fire ....................................11

III.    DR. KEVIN KELM'S EXPERT ANALYSIS OF ARSONIST BEHAVIOR......12

IV.     LEGAL FRAMEWORK .......................................................................................12

V.      THE EVIDENCE OF DEFENDANT'S MENTAL STATE IS
        ADMISSIBLE AS DIRECT EVIDENCE, AS INEXTRICABLY
        INTERTWINED EVIDENCE, OR AS RULE 404(B) EVIDENCE ...................14

        A.      Defendant's ChatGPT Communications..................................................14

        B.      Defendant's Support of Vigilantism and Anger at Billionaires.................17

        C.      Defendant's Use of Fire as a Tool for Cathartic Release and Threats........19

        D.      Defendant's Fascination with Wildfires and Emergency Responses .........20

        E.      Defendant's Anger and Loneliness on New Year's Eve 2024...................22

        F.      Defendant's Mental State After the Lachman Fire ....................................23

VI.     EVIDENCE OF DEFENDANT'S MENTAL STATE IS NOT
        PROHIBITED BY RULE 403 ..............................................................................24

VII.    CONCLUSION.....................................................................................................25

## **TABLE OF AUTHORITIES**

DESCRIPTION                                                                           PAGE

**Federal Cases**

Huddleston v. United States,
    485 U.S. 681 (1988) ................................................................................ 16, 18

In re Winship,
    397 U.S. 358 (1970) ...................................................................................... 16

United States v. Ayers,
    924 F.2d 1468 (9th Cir. 1991) ................................................................. 13, 18

United States v. Bailleaux,
    685 F.2d 1105 (9th Cir. 1982) ....................................................................... 24

United States v. Bibo-Rodriguez,
    922 F.2d 1398 (9th Cir. 1991).......................................................................... 18

United States v. Brashier,
    548 F.2d 1315 (9th Cir. 1976) ....................................................................... 24

United States v. Cherer,
    513 F.3d 1150 (9th Cir. 2008) ....................................................................... 25

United States v. Collins,
    90 F.3d 1420 (9th Cir. 1996) ......................................................................... 18

United States v. Curtin,
    489 F.3d 935 (9th Cir. 2007) (en banc) ......................................................... 21

United States v. Door,
    663 F. App'x 570 (9th Cir. 2016) .................................................................. 13

United States v. Dorsey,
    677 F.3d 944 (9th Cir. 2012) ......................................................................... 13

United States v. Hinostroza,
    297 F.3d 924 (9th Cir. 2002) ......................................................................... 18

United States v. LeMay,
    260 F.3d 1018 (9th Cir. 2001) ....................................................................... 13

United States v. Major,
    676 F.3d 803 (9th Cir. 2012) ......................................................................... 13

## TABLE OF AUTHORITIES (continued)

DESCRIPTION                                                                                          PAGE

United States v. Mayans,
    17 F.3d 1174 (9th Cir. 1994) ................................................................ 16

United States v. Meling,
    47 F.3d 1546 (9th Cir. 1995) ................................................................ 22

United States v. Nelson,
    137 F.3d 1094 (9th Cir. 1998) .............................................................. 16

United States v. Parker,
    549 F.2d 1217 (9th Cir. 1977) .............................................................. 14

United States v. Perkins,
    937 F.2d 1397 (9th Cir. 1991) .......................................................... 22, 23

United States v. Ramirez-Jiminez,
    967 F.2d 1321 (9th Cir. 1992) .......................................................... 19, 20

United States v. Vizcarra–Martinez,
    66 F.3d 1006 (9th Cir. 1995) ................................................................ 13

United States v. Vo,
    413 F.3d 1010 (9th Cir. 2005) .............................................................. 13

**Rules**

Fed. R. Evid. 403  ................................................................... 13, 24, 25

Fed. R. Evid. 404(b)................................................................... passim

Fed. R. Evid. 404(b)(2) ................................................................ 13

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Shortly after midnight on January 1, 2025, defendant intentionally lit a fire on a hillside above a wealthy neighborhood in the Pacific Palisades. He was alone, because he had been unable to find anyone to be with on New Year's Eve. Three years earlier, defendant had lived two blocks away from the same hillside, in a large house with his lover. But their relationship had ended, and defendant had moved to a small apartment in North Hollywood. By 2024, defendant was working as an Uber driver, he was struggling financially, he had no friends, and he was spending a large amount of time communicating with ChatGPT, which served as his diary and companion.

A grand jury indicted defendant on three arson-related counts in October 2025. Ever since defendant's arrest, his counsel has proclaimed to the media that defendant is not an arsonist and there is "not a single shred of evidence" that he started the fire. Defense counsel has held multiple press conferences at which he claimed that the government is prosecuting defendant as a "scapegoat," to cover up for the alleged failures of the Los Angeles Fire Department in preventing the Palisades Fire.[1] As summarized in the Complaint, even though no witness saw defendant start the fire, substantial evidence proves that defendant started the fire.

A central issue at trial will be defendant's mens rea. The government must prove that defendant acted maliciously (Counts One and Two) and willfully (Count Three). To meet its burden, the government intends to introduce a wide range of evidence showing defendant's state of mind before, during, and after the fire. As detailed below, evidence from a variety of sources – including defendant's former lovers, his acquaintances, his Uber passengers, and his use of ChatGPT and social media – establishes that defendant

---

[1] In a separately filed motion in limine, the government seeks to prevent the defense from attempting to blame the Los Angeles Fire Department for the fire that defendant started.

was angry, impulsive, troubled, and fixated on fire when he lit the fire on January 1, 2025.  The government intends to introduce this evidence in at least three ways.

First, as explained in this motion, the government intends to introduce much of the evidence of defendant's state of mind as evidence directly proving, or inextricably intertwined with, his criminal conduct, or pursuant to Rule 404(b).

Second, the government intends to call Dr. Kevin Kelm as an expert in arsonist behavior.  The government retained Dr. Kelm post-indictment, to review the evidence in this case to determine if he could render any opinions regarding defendant's conduct.  After conducting a thorough review, Dr. Kelm issued two detailed reports finding, among other things, that defendant's behavior was consistent with that of an expressive-revenge motivated arsonist.  (Exhs. C and D.)  A portion of Dr. Kelm's anticipated testimony will reference defendant's prior acts and hence will be based on some of the same evidence discussed below.  Dr. Kelm's anticipated testimony is not at issue in this motion but is relevant here because it corroborates the government's arguments herein.

Third, the government intends to use evidence of defendant's state of mind to cross-examine defense witnesses (including defendant) should they suggest that, for example, defendant did not have a motive to commit arson, or that the government improperly "profiled" defendant to create a scapegoat.  Defendant has noticed two experts (Ed Nordskog and Thomas Guzman) to testify about those very issues.[2]  Relatedly, the government intends to use this evidence to cross-examine character witnesses should they testify about defendant's purported good character traits.

This motion (1) describes the evidence of defendant's angry and troubled mental state, and (2) explains why such evidence is admissible for a variety of reasons under Rule 404(b) and otherwise.  The evidence discussed herein is central to the government's case.  To prove malicious and willful arson in a case with no eyewitnesses to the arson, the government must be permitted to marshal the evidence regarding defendant's state of

---

[2] The government is challenging other portions of Nordskog's and Guzman's expert testimony in a separately filed motion in limine.

2

mind and motive when he lit the fire, alone on an isolated hillside, in the middle of the night on January 1, 2025.

## II.    FACTUAL BACKGROUND

### A.    Defendant's History of ███████████████

The government is not seeking to admit the evidence discussed in this subsection pursuant to this motion.  The government offers it herein to provide the Court with context regarding defendant's mental state. [3]



_____

[3] This background information is also relevant to the expert opinion of Dr. Kevin Kelm.

3

4

████████████████████████████████████████

████████████████████████████████

From 2020 to approximately mid-2022, defendant was in a romantic relationship with P.F.  P.F. was renting a large home with a pool in the Pacific Palisades, and defendant moved in.  This was a happier time in defendant's life; he was social and in excellent health.  He frequently exercised on the trails above the neighborhood, including near the Hidden Buddha hillside where he started the Lachman Fire on January 1, 2025.  He and P.F. spent time together in the Hidden Buddha clearing, just 30 feet from where the Lachman Fire began; P.F. called the clearing their "spot."  When his relationship with P.F. ended in 2022, defendant had to move to a small apartment in North Hollywood.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

## B.    Defendant's ChatGPT Communications

Defendant was a prodigious user of ChatGPT in 2024; the app functioned as a diary and companion for defendant, who had few if any friends.  On July 10, 2024, defendant directed ChatGPT to generate an image, based on the following prompt that he created:

> "[O]n the far left, we're going to have our burning forest. And then you have a bunch of people running away from that, which leads us to the middle, where you're going to have hundreds of thousands of people that are in poverty and trying to get past this gate, this gigantic gate with a big dollar sign on it. And on the other side of the gate, or should I say the entire wall, is a conglomerate of all the richest people. And they're chilling there, watching the world burn down. And watching the people struggle, and they're laughing, and they're enjoying themselves, and they're dancing."

5

After ChatGPT generated an image, defendant became frustrated and instructed ChatGPT to tweak the image. With each image generated, defendant became increasingly agitated, inputting new and more precise instructions to refine the fiery image to his liking.  For example, defendant made the following clarifications:

"No, what are you fucking doing? Stick to what you said initially. On the left, a scene showing environmental destruction with burning trees and melting ice, blah blah blah. Fucking shit. And then just add what I said. Which is that the environmental destruction is happening because of the people on the right side of the wall."

"I said on the far left of the picture I wanted a forest burning. I don't see any forest. I never said the city was burning."

"The people are running away from the fire. Where do you see people running away from the fire in this fucking picture? Goddamn, you're such a fucking idiot. On the far left, the forest is burning."

"The wall splits the image vertically, you fucking moron. Can you just listen to what I say? It splits it vertically, vertically, vertically, vertically, you fucking idiot. It's not coming along and crossing into the fire. The gate is protecting the rich people from the climate who's going to shit. And all the people in the middle are trying to get on the other side of the gate. It's not fucking rocket science."

He further stated multiple times that the image was to capture the "feel of capitalism ... and the dark side of human beings" and highlight the "disparity and the direct connection between the two sides," referencing wealth.

Each image depicted large fires consuming the landscape on one side, and a society untouched by the flames on the other side.  Defendant saved twelve of these images to his Google cloud.  Exhibit E shows nine images that defendant saved in his Google cloud.

In the months leading up to New Year's Eve 2024, defendant continued to express anger, frustration, and depression about the wealth and power disparities in society and the "stress and anxiety" such inequity caused him.  Defendant described his mental state in numerous prompts he entered into ChatGPT, detailing the escalation of his anger and resentment.  For example:

- On August 18, 2024, defendant stated that on one day, he felt he could conquer the world, but in the next second, he was depressed.

6

- On August 20, 2024, defendant stated that he was "so angry right now" due to the AI failing to provide him with the information he requested.  Defendant stated he "might do something bad" and that "it comes down to maybe [him] harming somebody."

- On August 22, 2024, defendant asked, "Why am I so angry all the time?"

- On August 30, 2024, defendant described his pain and anxiety.  He stated that he felt extremely fooled by "this nonsense" and that if a situation like "you know, New Year's Eve, or dad wants to do his little thing about God," he would interrupt it.  Defendant said that he had anxiety about the world, how fast things were moving, and the "forces that are controlling the world."  He was exhausted by "how materialistic and capitalistic this fucking place is," and his frustration about the "few motherfuckers at the top that are … destroying the world and creating all this inequality."  Defendant said that he had difficulty finding his place in the world, he was very lonely, and he cried every day.

- On September 28, 2024, defendant said that he could see the whole world crashing and felt powerless.  He expressed his frustration about the world being controlled by money, and wealthy people causing inequality.  He felt stress and anxiety to do something, but the wealthy made it "impossible to make [collective action] happen."

- On November 1, 2024, defendant described the emotional release he had when he burned a bible in August 2024 and was crying for days.

- On November 22, 2024, defendant noted his "trust issues with people in this city" and then said that "everything that seems complicated to everyone else is simple to me.  To an extent, I'm a fucking genius in my mind.  Like, I'm neurologically very active and intelligent.  But to an extent, I'm also fucking very stupid, because although I'm very intelligent, I can't figure it out.  Other people have been in my place, and I've gotten out of here, so like, what the fuck is wrong with me?"

7

- On December 22, 2024, defendant queried what painkillers were "most efficient at making you feel emotionally numb."

- On December 29, 2024, defendant wrote about (1) his desire to do the job to "keep up" with people and get paid; (2) how tired he was "of this fucking stupid shit"; (3) his self-identified genius; (4) what he "wants" and whether he wanted to be a part of "fuckin' rich-ass motherfuckers that set up the system"; (5) his negativity due to a friend who told him he would get back to him about New Year's Eve but still had not; and (6) his anger at not receiving "genuine love."

### C.    Defendant's Support of Vigilantism and Anger at Billionaires

In the weeks before the Lachman Fire, including just hours before and after lighting the fire, defendant fixated on Luigi Mangione, who allegedly murdered the UnitedHealthcare CEO in New York City on December 4, 2024.  That case triggered polarizing public opinion, with some revering Mangione as a "modern-day Robin Hood" and his conduct as an expression of righteous anger towards the profits made by insurance companies.  Mangione became a symbol of "justified violence."

On December 12 and 13, 2024, defendant searched the internet for Mangione-related news, using the search terms "free Luigi Mangione," "lets take down all the billionaires," and "reddit lets kill all the billionaires."  Several of defendant's Uber passengers on December 31, 2024 and January 1, 2025, described defendant as angry, intense, driving erratically, and ranting about being "pissed off at the world" and Mangione, capitalism, and vigilantism.  On January 3, 2025, defendant took a screenshot of an article about Mangione pleading not guilty.

On January 24, 2025, when investigators asked defendant why someone might commit arson in the Pacific Palisades, he responded that it would be out of resentment of the rich enjoying their money as "we're basically being enslaved by them" and compared such an act of "desperation" to the murder for which Mangione was charged.

On July 29, 2025, defendant inputted into ChatGPT statements and questions relating to the owner of DoorDash (Tony Xu) and wanting to kill him because of

defendant's belief that "change [and] rebalance only comes with violence for societal economic or physical collapse." Defendant stated that he wanted to get a gun and murder Xu, querying ChatGPT whether there had been any assassination attempts, asking for Xu's address and whether he had security or kids. Defendant described a desire to have superpowers to annihilate "those repulsive mistakes of nature." He stated, "Die in Hell" and "Burn." Defendant also researched whether the death of Josh Pickles, a 37-year-old DoorDash executive who died in June 2025, was celebrated and whether such celebration of his death was controversial.

### D.      Defendant's Use of Fire As a Tool for Cathartic Release and Threats

In moments of emotional despair and frustration, defendant used fire as a vehicle for emotional catharsis and a behavioral response to his negative emotions. Defendant grew up in a religious household and was in frequent conflict with his parents as a result. In August 2024, defendant burned a bible and later described the act in ChatGPT as "necessary" and "amazing."

In April 2025, defendant moved out of his North Hollywood apartment and into his sister's house in Florida because she refused to continue supporting him financially while he lived in California (she is married, with two small children, and has a serious medical condition). Within two days of moving to Florida, defendant got into a dispute with his sister about a lawsuit he was involved in. In response, defendant "blew up" and threatened to burn her house down, while yelling statements like "why did you bring me here." (His sister's family called 911 regarding defendant multiple times during his stay with her.)

### E.      Defendant's Fascination with Wildfires and Emergency Responses

On November 8, 2018, the massive Woolsey Fire ignited, ultimately burning portions of Los Angeles and Ventura Counties over the next two weeks. Defendant recently had arrived in Los Angeles, after having raped and kidnapped A.M. to bring her to California. On November 9, 2018, defendant drove through the Santa Monica and Winnetka areas with A.M. to admire the Woolsey Fire. Defendant told A.M. that he was

in awe of the fire and that it was part of history; he told her to take a video of the fire, which she did.

On November 17, 2024, defendant photographed the infotainment screen in his car showing a news alert for the FBI offering a $25,000 reward for information about a suspect behind the Northwest ballot box fires. (When investigators searched defendant's phone pursuant to federal warrants, they found no other images of defendant's infotainment screen depicting news alerts.)

On December 5, 2024, defendant accessed media files of the Line Fire, a wildfire that was ignited by an arsonist on September 5, 2025, and blazed through the San Bernardino area for 110 days, burning over 43,000 acres of land.

On December 29, 2024, just two days before the Lachman Fire, defendant recorded three videos of fire engines departing LAFD Station No. 27 in the Hollywood area. While recording, defendant said out loud (apparently to himself), "They're coming for you bro, I'm telling you, you got to get that mental fuckin brains in order, and not be liking this craziness, they're on their way, don't worry."

**F.     Defendant's Anger and Loneliness on New Year's Eve 2024**

In the days leading up to the Lachman Fire, defendant exhibited extreme anger, indignation, and frustration about being unable to find companionship on New Year's Eve. Defendant was upset about his relationship with K.A., a former co-worker whom he had briefly dated in March 2024. Between December 26 and 29, 2024, defendant messaged with K.A. about New Year's Eve, and he inputted details of his feelings about K.A. into ChatGPT more than fifty times. When, on December 30, 2024, K.A. requested space from defendant, he had a visceral reaction: he left her two manic voicemails and entered prompts into ChatGPT expressing his extreme displeasure of her treatment of him. Defendant reached out to at least two other people to make plans, but one did not remember who defendant was, and the other had plans for which defendant was not invited.

10

An hour or two after lighting the fire on January 1, 2025, defendant told a bystander (falsely) that defendant had been at a party that night. Later that day, defendant told a female Uber passenger (falsely) that he had gone out with friends on New Year's Eve. Defendant stared at the passenger during the ride, and after he dropped her off, he lurked outside of her apartment and called her to ask her out on a date.

## G.    Defendant's Mental State After the Lachman Fire

On January 6, 2025, defendant video-recorded himself experiencing a self-identified "mental breakdown." He appeared gaunt and withdrawn, in contrast to photographs showing him healthy and fit three years earlier when he lived with P.F. in the Pacific Palisades.

From January 7 to 13, 2025, defendant searched the internet for the Palisades Fire and related terms. On January 8, 2025, defendant took a screenshot of a search page and article related to the fires and queried ChatGPT whether the fires in California seemed "purposeful," requesting ChatGPT to "do [its] own research and tell [him] what [it] think[s]." From January 7 to 22, 2025, defendant searched, via Google or ChatGPT, for the distance of an energy gun (which could start a wildfire); aerial views of the fire; news relating to insurance companies; the scale of the destruction; celebrity homes destroyed in the fire; and general statistics relating to wildfires, fire departments, and fire risks; he also accessed videos on how the fire started and the staggering destruction it caused.

On February 1, 2025, a week after the execution of federal search warrants for defendant's digital devices, defendant asked ChatGPT how to delete iCloud conversations and media.

On March 4, 2025, by which time investigators had informed defendant that they had obtained geolocation data for defendant's 911 calls during the fire on January 1, 2025, defendant searched on the internet whether 911 calls transmitted location data even when offline, and he accessed a Reddit forum related to calling 911 without

11

service.  On March 13, 2025, defendant inputted into ChatGPT his observations that Uber tracked his location.

## III.   DR. KEVIN KELM'S EXPERT ANALYSIS OF ARSONIST BEHAVIOR

The two expert reports authored by Dr. Kelm in this case corroborate the government's position that evidence of defendant's mental state in 2024 and 2025 is probative of his mens rea and motives on January 1, 2025.  (Exhs. C & D.)

Dr. Kelm is a nationally recognized expert on arsonist behavior.  As detailed in his reports, he concluded that "the antecedent behaviors documented in this investigation" – including defendant's social isolation and loneliness, emotional volatility, ██████████ ████████████████ vandalism, obsessive interest in income inequality, self-described intellectual superiority, and use of ChatGPT to create violent imagery – "strongly supports the notion that the stressors in the defendant's life and his response to them are entirely consistent with the research related to arson motivation."  (Exh. C at 8-9.)  Dr. Kelm concluded that revenge – "using fire to express anger or emotional pain" and "reassert control when faced with perceived injustice or rejection" – was the primary motive of the Lachman Fire, as indicated by, <u>inter alia</u>, defendant's history of anger and grievance, including his interpersonal conflicts and loneliness on New Year's Eve, and his decision to light the fire next to a neighborhood that had emotional significance to him.  (Exhs. C at 10-11 & D at 23-25.)

To be clear, the evidence discussed in this motion is admissible irrespective of Dr. Kelm's testimony (and Dr. Kelm's testimony is admissible irrespective of the admissibility of the evidence discussed herein).  Dr. Kelm's expert conclusions buttress the government's arguments below that defendant's mental state in the months before and after the Lachman Fire is relevant to prove the arson.

## IV.   LEGAL FRAMEWORK

The Ninth Circuit has "held that evidence should not be considered 'other crimes' or 'other act' evidence within the meaning of Rule 404(b) if 'the evidence concerning the 'other' act and the evidence concerning the crime charged are inextricably

intertwined.'" United States v. Dorsey, 677 F.3d 944, 951 (9th Cir. 2012) (quoting United States v. Soliman, 813 F.2d 277, 279 (9th Cir. 1987)).  Other act evidence is inextricably intertwined with the charged crime when "it constitutes a part of the transaction that serves as the basis for the criminal charge," and "when it was necessary to [admit] in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime."  United States v. Vizcarra–Martinez, 66 F.3d 1006, 1012-13 (9th Cir. 1995).

Rule 404(b) permits evidence of other acts to prove, among other things, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  This list is non-exhaustive.  See id.  The Ninth Circuit has repeatedly held that the Rule is one of "inclusion," permitting evidence of other relevant acts "except where it tends to prove only criminal disposition."  United States v. Ayers, 924 F.2d 1468, 1472-73 (9th Cir. 1991).  Evidence may be admitted under Rule 404(b) if it: (1) "tends to prove a material point"; (2) "is not too remote in time"; (3) "is sufficient to support a finding that the defendant committed the other act"; and (4) "(in cases where knowledge and intent are at issue) the act is similar to the offense charged."  United States v. Vo, 413 F.3d 1010, 1018 (9th Cir. 2005).  The threshold to find that a point is material is low.  The evidence of other acts "need not be *absolutely necessary* to the prosecution's case in order to be introduced; it must simply be helpful or practically necessary."  United States v. Door, 663 F. App'x 570, 572 (9th Cir. 2016) (emphasis in original) (internal quotation marks omitted).  For example, in United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001), the Ninth Circuit upheld the admission of prior criminal acts where the defendant simply "attacked the credibility" of his accusers and "capitalized on the lack of eyewitness and expert testimony."  Id. at 1029.

"Once it has been established that the evidence offered serves one of the purposes authorized by Rule 404(b)(2), the only conditions justifying the exclusion of the evidence are those described in Rule 403."  United States v. Major, 676 F.3d 803, 808

(9th Cir. 2012) (cleaned up).  But Rule 404(b) evidence "is not rendered inadmissible because it is of a highly prejudicial nature . . . The best evidence often is."  United States v. Parker, 549 F.2d 1217, 1222 (9th Cir. 1977) (citation omitted).

**V.    THE EVIDENCE OF DEFENDANT'S MENTAL STATE IS ADMISSIBLE AS DIRECT EVIDENCE, AS INEXTRICABLY INTERTWINED EVIDENCE, OR AS RULE 404(B) EVIDENCE**

**A.    Defendant's ChatGPT Communications**

Defendant's prompts asking ChatGPT to generate images of a wildfire engulfing the poor while the rich enjoy their lives are, at a minimum, inextricably intertwined with the charged offenses.  As set forth in Part II.B, supra, with each image generated, defendant became increasingly frustrated, inputting instructions to refine the images to his liking.  The images (nine of which he saved to his Google cloud account) bore a striking resemblance to the fire defendant ignited on January 1, 2025, which tore through a hillside above his former neighborhood.

Defendant associated the neighborhood with wealth and elitism.  During a recorded interview on January 24, 2025, he expressed resentment at how people treated him differently when he lived in that neighborhood because they believed he was wealthy.  When asked why someone might light the fire intentionally, he explained that it would be because of anger towards the rich residents and their private trail going up that hill.

The ChatGPT images and prompts offer unique insight into defendant's state of mind when he lit the fire.  They capture his words, precise details, and characterizations of what he wanted to see – a fire bearing physical and symbolic similarities to the fire he ignited on January 1, 2025.  ChatGPT served as defendant's diary; this evidence is akin to a manifesto of his goals and intent to commit arson.  As such, it is direct evidence of defendant's mental state.

Just as defendant's wildfire-related ChatGPT prompts and images mark the beginning stage of defendant's decline toward arson, many of defendant's ChatGPT

14

prompts in the second half of 2024 reflect his deteriorating mental state. As the examples described in Part II.B, supra, demonstrate, during this time period defendant was "angry all the time," "depressed," seeking to be "numb," "very very lonely," erratic, and increasingly frustrated at the world. His anger stemmed from (1) inequality and injustice caused by the wealthy, (2) feeling unloved, and (3) believing himself to be intellectually superior but socially inferior. This evidence is inextricably intertwined with the charged crimes.

In the months leading up to the fire, defendant focused on his despair and anger at materialistic people, capitalism, being controlled by the wealthy, and the "motherfuckers at the top … destroying the world and creating all this inequality." Defendant explained that he felt stress and anxiety to do something about it but blamed the wealthy for making it impossible to take collective action. During defendant's recorded interview on January 24, 2025, he spoke at length about what he perceived to be an unbalanced and disproportional "system" and explained that "they'll always take you down" so instead "you gotta take them down." In this context, defendant stated, "this is what I disrupted." Relatedly, defendant's purported intellectual superiority and frustration at his lack of social and economic status contributed to his state of mind and desire to act. Such reflections of his "genius," escape, and the relief he felt when he burned a bible tend to show defendant's state of mind during the charged offenses.

To omit such evidence would deprive the jury of a coherent and comprehensible story of the commission of defendant's crimes. It would effectively drop the jury in the middle of the act with no background or understanding of how or why defendant got to his mental state on January 1, 2025. Without this information, the jury would mistakenly believe that defendant lit the fire out of the blue, or accidentally – when it was, in fact, a real-world enactment of the fantasy that he had created using ChatGPT. This evidence shows that defendant had a reason for his conduct (however misguided), and that reason grew from months of defendant stewing in his anger, resentment, and lonesomeness that he blamed on the world and those with wealth and power.

15

Alternatively, the ChatGPT evidence is admissible under Rule 404(b) for several non-propensity purposes, including intent, knowledge, motive, and lack of accident or mistake. These acts prove a material issue in the case: defendant's mens rea. See, e.g., In re Winship, 397 U.S. 358, 364 (1970); United States v. Nelson, 137 F.3d 1094, 1107 (9th Cir. 1998) (a defendant's state of mind is relevant even if undisputed at trial); United States v. Mayans, 17 F.3d 1174, 1182 (9th Cir. 1994) ("[T]he government contends that knowledge and intent were material issues in the case simply because the government had to prove them. The government is correct on this point."). Defendant's state of mind will be heavily disputed; defense counsel has been telling the press that defendant may have lit the fire accidentally with a cigarette (or mistakenly believed he that he had). Rule 404(b) evidence can be "critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." Huddleston v. United States, 485 U.S. 681, 685 (1988).

The ChatGPT evidence establishes that defendant acted intentionally and knowingly when he lit the fire and it was not by accident or mistake. The wildfire-related prompts and images were a manifestation of his intent. He imagined a scene and later executed it. The continuity between the prompts and images and defendant's crimes tends to demonstrate the intentionality behind his conduct on January 1, 2025.

Defendant's ChatGPT communications that indicated his anger about social and economic injustice in the second half of 2024 are admissible under Rule 404(b) for the same reasons. This evidence shows – in defendant's own words – his intent, motive, and absence of mistake or accident in setting a fire next to his former neighborhood, which he felt exemplified the "materialistic" and "capitalistic" "motherfuckers at the top that are … destroying the world and creating all this inequality." Setting fire to the hillside was – as defendant described about burning a bible – a "necessary," "amazing," and "liberating" emotional release.

16

None of the ChatGPT evidence is too remote in time, as it was within the five or six months leading up to the fire.  There is sufficient evidence that defendant committed the acts as they are his own words in his ChatGPT records and images found in his cloud drive.  Finally, the acts are similar to the charged offenses.  Most notably, the wildfire images that defendant generated are visual previews of the fire he ignited on January 1, 2025.

### B.    Defendant's Support of Vigilantism and Anger at Billionaires

As set forth in Part II.C, supra, before lighting the fire and then on the night of the fire, defendant was fixated on what Luigi Mangione represented.  This evidence is, at a minimum, inextricably intertwined with the charged crimes.

Defendant was searching for news and movements associated with Mangione, such as the fight against the rich.  One of his search terms was "kill the billionaires," a phrase distorted from a nonviolent movement called "stop billionaires" aimed at disrupting extreme wealth and political influence.  This was an escalation of defendant's anger and resentment of the wealthy.  On the night of the fire, several of defendant's Uber passengers observed him ranting about capitalism and aggrandizing Mangione and vigilantism.  During his January 24, 2025 interview, defendant hypothesized that if a person lit the fire intentionally, it would have been an act of resentment towards the wealthy residents.  He analogized such desperation to the motive behind the murder of a CEO – something he contemplated on the night he lit the fire.  Defendant was emboldened by Mangione's acts and consumed by his own anger and desire to seek relief from his frustration at being "powerless" and socially inferior.  Evidence that weeks before and on the night of the fire, defendant was considering more radical options like vigilantism and justified violence against the wealthy is necessary context for the jury to consider when evaluating his conduct.

The same holds true for defendant's ChatGPT inquiries in July 2025 regarding killing the owner of DoorDash.  Defendant's statements are probative of the long-

17

standing core beliefs he expressed in the months leading up to lighting the Lachman Fire (and on the night of the fire itself).

In the alternative, the same evidence is admissible pursuant to Rule 404(b). Evidence of defendant's fixation on changing the "system" through violence and vigilantism is helpful to the jury because it proves a material point – that defendant had a motive for lighting the fire on January 1, 2025, and that his conduct was malicious. The "only means of ascertaining [defendant's] mental state is by drawing inferences from conduct." Huddleston, 485 U.S. at 685. "The jury cannot be expected to make its decision in a void–without knowledge of the time, place, and circumstances of the acts which form the basis of the charge." United States v. Collins, 90 F.3d 1420, 1429 (9th Cir. 1996) (quoting United States v. Daly, 974 F.2d 1215, 1216 (9th Cir. 1992)). The jury is entitled to consider this evidence and understand the circumstances surrounding defendant's actions that night.

The evidence described is not too remote in time. Defendant's written admissions of his anger at the wealthy and frustration, his not being able to "figure it out" despite his intellectual superiority, and his fixation on radical change and vigilantism were from the days, weeks, and months before the fire. The related statements that defendant made about wanting to kill the owner of DoorDash were seven months after the fire, but their status as "subsequent" acts does not change the probative value or admissibility. As the Ninth Circuit has recognized, "[o]ur precedent has squarely resolved in the government's favor the issue that subsequent Rule 404(b) evidence may be relevant and admissible." United States v. Hinostroza, 297 F.3d 924, 928 (9th Cir. 2002) (citing United States v. Bibo-Rodriguez, 922 F.2d 1398, 1400 (9th Cir. 1991)); see Ayers, 924 F.2d at 1473. "By its very terms, [Rule] 404(b) does not distinguish between 'prior' and 'subsequent' acts." Bibo-Rodriguez, 922 F.2d at 1400.

There is also sufficient support that defendant committed the acts. Nearly all the evidence comes from defendant's own words and his digital devices. The remaining

18

evidence is testimony from Uber passengers whom defendant drove on the night of the fire.

Finally, the evidence is admissible as it is also meaningfully similar in the aspects that matter.  "Similarity is not always a prerequisite under Rule 404(b)."  United States v. Ramirez-Jiminez, 967 F.2d 1321, 1326 (9th Cir. 1992).  Rather, it is "a factor pertinent to rational appraisal of the probative value of the evidence in relation to the purpose for which it is being offered."  Id.  When offered to prove knowledge, "the prior act need not be similar to the charged act as long as the prior act was one which would tend to make the existence of the defendant's knowledge more probable than it would be without the evidence."  Id.  Here, defendant's other acts are similar in that both the prior acts and the charged crimes encompass defendant's emotional state (anger, resentment, frustration) and response to intense emotional and intellectual triggers (his desire to "disrupt" the status quo).  This evidence tends to make defendant's intent, motive, knowledge, and lack of accident or mistake more probable than they would be without the evidence.

### C.    Defendant's Use of Fire as a Tool for Cathartic Release and Threats

As set forth in Part II.D, supra, defendant (1) burned a bible in August 2024 to relieve pent-up frustration and anger for religion, and (2) threatened to burn down his sister's home in early April 2025 in an expression of anger at her lack of financial support and for "bringing" him to Florida.  This evidence is admissible under Rule 404(b) because it is probative of defendant's intent, motive, knowledge, and absence of mistake or accident during the charged offenses.  These other acts and the charged offenses share a probative similarity: in each instance, defendant responded to anger or frustration by engaging in or threatening fire-related destructive conduct aimed at symbolically meaningful items or places.

The evidence tends to prove a material point as it bears on defendant's intent and motive in the charged crimes.  Defendant had a complicated and emotionally charged relationship with his father, a religious missionary.  Religion deeply angered defendant

as he felt frustrated and unheard in conversations with his father.  In response, in August 2024, defendant burned a bible and described the relief he felt as "amazing," "liberating," and "necessary."  Then, on January 1, 2025, following months of anger at the world, frustration, and feelings of isolation, defendant lashed out by burning a place of personal and symbolic significance.  A few months later, when defendant again felt angry and frustrated at his sister for "bringing" him to Florida, he threatened to burn down her house.  This pattern of emotional provocation followed by fire-setting or threats of fire-setting as a tool for cathartic release and symbolic communication demonstrates that the charged offenses were intentional and motivated.  The evidence undermines the defense's claim that defendant might have lit the Lachman Fire accidentally.

The evidence is not too remote in time.  The bible burning occurred less than five months before the fire, and defendant had it top of mind in November 2024 when he told ChatGPT how incredible that act was for him.  The threat to burn down his sister's house occurred in the spring of 2025, only a few months after the fire.  There is also sufficient support that defendant committed the acts: the bible burning is proven by defendant's digital and ChatGPT evidence, and the threat to burn down his sister's house was reported to police by his sister and brother-in-law.

Finally, the evidence is admissible as it is sufficiently similar.  The other acts are not offered to prove identity through a distinctive modus operandi, and thus, do not need to meet a higher "signature" standard of similarity.  Instead, they are offered for the permissible and well-established purpose of showing defendant's state of mind.  Through a "rational appraisal," they tend to make defendant's knowledge and intent more probable than it would be without the evidence.  Ramirez-Jiminez, 967 F.2d at 1326.

**D.  Defendant's Fascination with Wildfires and Emergency Responses**

As set forth in Part II.E, supra, (1) in November 2024, defendant documented the FBI's reward for information about an arson suspect; (2) in December 2024, defendant

20

took interest in the Line Fire, a wildfire caused by an arsonist that had been burning for over two months; and (3) just two days before the Lachman Fire, defendant video-recorded fire engines while telling himself to "not be liking this craziness." This evidence is, at a minimum, inextricably intertwined with the charged offenses.

This evidence demonstrates what was on defendant's mind in the weeks leading up to the fire. Defendant's interest in an FBI arson-related reward and his act of recording the fire engines reflect his focus on arson and emergency responses to fires. Evidence that defendant accessed imagery of a fire lit by an arsonist that blazed through San Bernardino for months tends to show knowledge, preparation, and awareness of the destructive consequences of setting a fire in drought-ravaged Southern California at the time. Together, this evidence depicts a behavioral trajectory culminating in the charged arson that will give the jury a complete picture of defendant's knowledge and preparation. This evidence also shows that defendant knew how his fire could spread and that the fire suppression might not be immediate (as with the Line Fire) and was not deterred.

In the alternative, this evidence is also admissible as Rule 404(b) evidence of defendant's intent, knowledge, motive, preparation, and absence of mistake or accident. It tends to prove a material point as discussed above: his state of mind. The Ninth Circuit permits the admission of other-act evidence where it tends to show a defendant's familiarity with or purposeful engagement in conduct similar to the charged offense, so long as it is offered for a non-propensity purpose. See United States v. Curtin, 489 F.3d 935 (9th Cir. 2007) (en banc) (holding that materials reflecting a defendant's interest in conduct similar to the charged offense are admissible to prove intent and state of mind). Here, defendant's interest in arson-related content tends to prove that the charged act was not accidental or mistaken, but instead intentional and informed by prior exposure, making it relevant to disputed elements of the offense.

The evidence is not too remote in time as it is from the weeks leading up to the Lachman Fire. There is sufficient support that defendant committed the acts as they are

from his digital devices.  And the evidence bears sufficient similarity to the charged crimes as it is related to arson, fires, and fire responses.  This evidence makes the existence of the defendant's knowledge more probable than it would be without it.

Finally, evidence that defendant was captivated by the Woolsey Fire in 2018 also is admissible to prove defendant's consciousness of guilt.  During his interview on January 24, 2025, defendant told investigators that he had never seen anything like the Lachman Fire in person; that was false.  See United States v. Perkins, 937 F.2d 1397, 1402 (9th Cir. 1991).  Evidence of consciousness of guilt is intrinsic to the charged crime as it demonstrates his response to the crime, much like a confession.  See United States v. Meling, 47 F.3d 1546, 1557 (9th Cir. 1995) (consciousness of guilt is second only to a confession in terms of probative value).

**E.      Defendant's Anger and Loneliness on New Year's Eve 2024**

As set forth in Part II.F, supra, after months of growing frustration at an unjust world, defendant's inability to find companionship on New Year's Eve became a triggering emotional event.  This evidence is, at a minimum, inextricably intertwined with the charged crimes.

In the days leading up to New Year's Eve, defendant was rejected by at least three people he tried to connect with for the holiday.  He had a visceral reaction to this rejection as is evident from the messages he left K.A. and over fifty prompts he entered into ChatGPT regarding her purported audacity.  Defendant explained to ChatGPT, three days before lighting the fire, he was angry that he could not receive "genuine love."  Dejected, he hiked up the Hidden Buddha hillside, alone just before midnight on New Year's Eve.  This location epitomized his former life in the Pacific Palisades, when he was treated differently by society and in a nurturing relationship.  Defendant later told investigators that he had been to the Hidden Buddha clearing thousands of times when he lived down the block with P.F. and that he had many positive memories of that spot.  However, as his multiple Uber passengers that night witnessed, defendant was not nostalgic or happy that evening; he was angry, erratic, and bitter at the wealthy and

social elite, ranting about taking them down.  When defendant got to the Hidden Buddha hillside, he called P.F., who did not respond.  With this final rejection, defendant went up the hill and started a fire right above the neighborhood that caused his despair.

Evidence of defendant's loneliness and failed attempts at connection on New Year's Eve is proof of defendant's state of mind during the commission of the crime and is inextricably intertwined with the offense.  The evidence is critical for the jury to understand what was in defendant's mind at the time he lit the fire and why he acted as he did.

Similarly, evidence of defendant lying to a female Uber passenger on January 1, 2025, that he was out with friends the night before and then seeking her companionship corroborates the emotional state he was in during the offense and demonstrates his consciousness of guilt as he distanced himself from the fire.  See Perkins, 937 F.2d at 1402 (9th Cir. 1991) (false exculpatory statements are admissible as circumstantial evidence of consciousness of guilt).

The same evidence is also admissible under Rule 404(b).  As discussed above, this evidence is helpful to the jury because it proves a material point – that defendant had a motive for lighting the fire on January 1, 2025, and that his conduct was malicious.

The evidence is not too remote in time; it is from a few days before the fire.  There is also sufficient support that defendant committed the acts.  The evidence comes from defendant's own words, as captured in his digital devices, and from lay witnesses.  Finally, the evidence is meaningfully similar in the aspects that matter.  Defendant's bitter loneliness and anger in the days leading up to the arson tends to make his intent, motive, knowledge, and lack of accident or mistake more probable than they would be without the evidence.

**F.     Defendant's Mental State After the Lachman Fire**

As set forth in Part II.G, supra, evidence from after the Lachman Fire reflects defendant's continually depressed mental state, his interest in the fire, and his interest in concealing evidence regarding his role in the fire.  The fact that on January 6, 2025,

23

defendant recorded himself experiencing a self-identified "mental breakdown" is consistent with what he described about his bible-burning experience, where he felt extreme elation only to be then brought down to reality. This evidence is intrinsic to the offense much like consciousness of guilt as it tracks defendant's reaction to the fire, albeit specific to his behavioral patterns. It is thus part of the narrative of the crime and the aftermath. It is also admissible under Rule 404(b) as it tends to prove a material point (defendant's commission of the offense), is not too remote in time (5 days after the crime), sufficiently supported (proven by digital evidence), and sufficiently similar (bearing directly on defendant's state of mind).

Evidence of defendant's (1) internet search history in January 2025 relating to the Palisades Fire and statistics about wildfires, and (2) internet search history about how to delete iCloud content, 911 location data, and Uber location-tracking is intrinsic to the offense and similarly circumstantial evidence of consciousness of guilt. See, e.g., United States v. Brashier, 548 F.2d 1315, 1325 (9th Cir. 1976) ("the concealment of evidence subsequent to a commission of a crime . . . may indicate consciousness of guilt and should be placed before the trier of fact"). Thus, it is not within the scope of Rule 404(b). Nonetheless, it is also admissible under Rule 404(b) as it tends to prove a material point (defendant's commission of the offense), is not too remote in time (within a few months of the crime and shortly after a confrontation with law enforcement), sufficiently supported (proven by digital evidence), and sufficiently similar (bearing directly on defendant's state of mind).

## VI. EVIDENCE OF DEFENDANT'S MENTAL STATE IS NOT PROHIBITED BY RULE 403

Under Rule 403, prejudice is only "unfair" to the extent that it "provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir. 1982).

24

Here, none of the evidence that the government seeks to introduce has the tendency to provoke an emotional response in a way that would warrant precluding the evidence at trial.  Indeed, the evidence described above is far less inflammatory than what defendant did in this case: maliciously lighting a fire that tore through the Pacific Palisades.  If the Court believes there is some lingering risk of prejudice to defendant, it may give a limiting instruction, which the Ninth Circuit repeatedly has found to ameliorate residual risk of prejudice from Rule 404(b) evidence.  See, e.g., United States v. Cherer, 513 F.3d 1150, 1159 (9th Cir. 2008) (citing United States v. Dhingra, 371 F.3d 557, 566-67 (9th Cir. 2004)).

Moreover, no reasonable juror will be distracted, confused, or misled by the contextual evidence of defendant's mental state.  Unlike in some cases, the other acts evidence here does not call for complex proof of defendant's commission of acts.  Instead, the government will prove the acts through digital evidence of defendant's own words and very brief and narrow testimony by a handful of witnesses.  The government expects this evidence would take less than a day to present.  This would not lead to a trial-within-a-trial, cause undue delay, or waste time.  The other acts are directly relevant to core issues and elements in dispute, so introducing them would not be "needless."  See Fed. R. Evid. 403.

## VII.   CONCLUSION

For the aforementioned reasons, the government respectfully requests that the Court grant this motion.

25