TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
MARK A. WILLIAMS (Cal. Bar No. 239351)
Assistant United States Attorney
Chief, Environmental Crimes & Consumer Protection Section
MATTHEW W. O'BRIEN (Cal. Bar No. 261568)
DANBEE C. KIM (Cal. Bar No. 350014)
Assistant United States Attorneys
Environmental Crimes & Consumer Protection Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3359/8644/6530
    Facsimile: (213) 894-1019
    Email:    mark.a.williams@usdoj.gov
            matthew.o'brien@usdoj.gov
            danbee.kim2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JONATHAN RINDERKNECHT,<br>  aka "Jonathan Rinder,"<br>  aka "Jon Rinder,"<br><br>    Defendant. | No. CR 25-833-AH<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE NO. 1 AND DAUBERT MOTION TO EXCLUDE THE OPINION TESTIMONY OF GOVERNMENT EXPERT DR. KEVIN L. KELM; DECLARATION OF DR. KEVIN L. KELM; DECLARATION OF DANBEE C. KIM; EXHIBITS<br><br>Hearing Date:  May 13, 2026<br>Hearing Time:  10:00 a.m.<br>Location:  Courtroom of the Hon.<br>          Anne Hwang<br><br>**REDACTED** |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorneys Mark A. Williams, Matthew W. O'Brien, and Danbee C. Kim, hereby files its opposition to defendant's Motion in Limine No. 1 and Daubert Motion To Exclude the Opinion Testimony of Government Expert Dr. Kevin L. Kelm.

This motion is based upon the attached memorandum of points and authorities, the Declaration of Dr. Kevin L. Kelm, the Declaration of Danbee C. Kim and the exhibits thereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 22, 2026                    Respectfully submitted,

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division


_/s/_
MARK A. WILLIAMS
MATTHEW W. O'BRIEN
DANBEE C. KIM
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     DR. KELM'S ANTICIPATED TESTIMONY IF THIS WERE A NORMAL TRIAL ...................................................................................................2

        A.      The Scope of the Anticipated Testimony .........................................................2

        B.      The Anticipated Testimony Is Admissible .......................................................5

                1.      Legal Framework ..................................................................................5

                2.      The Testimony Is Admissible ..............................................................7

III.    DR. KELM'S BROADER ANTICIPATED TESTIMONY GIVEN THE DEFENSE STRATEGY HERE ...........................................................................8

        A.      The Anticipated Defense ...............................................................................8

                1.      Mr. Nordskog's Expert Testimony ......................................................8

                2.      The Attacks of the Criminal Investigation and Investigators ............9

        B.      Because of the Anticipated Defense, a Broader Range of Testimony from Dr. Kelm Is Admissible ........................................................................11

                1.      The Defense Is "Opening the Door" ..................................................11

                2.      Background Evidence .........................................................................13

IV.     DR. KELM'S TESTIMONY IS RELIABLE AND HELPFUL ..........................14

        A.      Legal Framework .........................................................................................14

        B.      Dr. Kelm's Testimony Is Reliable .................................................................15

        C.      Dr. Kelm's Testimony Is Helpful..................................................................18

        D.      Dr. Kelm's Testimony Is Not Barred by Rule 404 or Rule 403 .................18

V.      THERE IS NO NEED FOR A DAUBERT HEARING........................................19

VI.     CONCLUSION...................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

<u>DESCRIPTION</u>                                                                                                    <u>PAGE</u>

**Cases**

<u>Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.</u>,
738 F.3d 960 (9th Cir. 2013) ..................................................................... 18

<u>Kumho Tire Co. v. Carmichael</u>,
526 U.S. 137 (1999) .......................................................................... 14, 16

<u>Daubert v. Merrell Dow Pharm., Inc.</u>,
509 U.S. 579 (1993) .......................................................... <u>14, 15, 17, 19</u>

<u>Daubert v. Merrell Dow Pharm., Inc.</u>,
43 F.3d 1311 (9th Cir. 1995) ................................................................. <u>14</u>

<u>Moore v. Ashland Chem., Inc.</u>,
151 F.3d 269 (5th Cir. 1998) ................................................................. 14

<u>Mukhtar v. Cal. State Univ.</u>,
299 F.3d 1053 (9th Cir. 2002) ............................................................... 15

<u>Stilwell v. Smith & Nephew, Inc.</u>,
482 F.3d 1187 (9th Cir. 2007) ............................................................... 19

<u>United States v. Alatorre</u>,
222 F.3d 1098 (9th Cir. 2000) ............................................................... 19

<u>United States v. Beltran-Rios</u>,
878 F.2d 1208 (9th Cir. 1989) .................................................... 11, 12, 18

<u>United States v. Brown</u>,
880 F.2d 1012 (9th Cir. 1989) ................................................................. 6

<u>United States v. Day</u>,
591 F.2d 861 (D.C. Cir. 1978) ................................................................. 5

<u>United States v. Giese</u>,
597 F.2d 1170 (9th Cir.) ......................................................................... 11

<u>United States v. Gomez-Norena</u>,
908 F.2d 497 (9th Cir. 1990) ........................................................... <u>passim</u>

## **TABLE OF AUTHORITIES (continued)**

DESCRIPTION                                                                                   PAGE

United States v. Halamek,
  5 F.4th 1081 (9th Cir. 2021) ............................................................................... 16

United States v. Hill,
  643 F.3d 807 (11th Cir. 2011) ............................................................................... 5

United States v. Holguin,
  51 F.4th 841 (9th Cir. 2022) ............................................................................... 19

United States v. Kadir,
  718 F.3d 115 (2d Cir. 2013) ............................................................................... 6

United States v. Khan,
  787 F.2d 28 (2d Cir. 1986) ............................................................................... 12

United States v. Kinchen,
  729 F.3d 466 (5th Cir. 2013) ............................................................................... 6

United States v. Martin,
  523 F.3d 281 (4th Cir. 2008) ............................................................................... 6, 7

United States v. Mejia-Luna,
  562 F.3d 1215 (9th Cir. 2009) ............................................................................... 6

United States v. Segall,
  833 F.2d 144 (9th Cir. 1987) ............................................................................... 11

United States v. Wells,
  879 F.3d 900 (9th Cir. 2018) ............................................................................... 11

Windham v. Merkle,
  163 F.3d 1092 (9th Cir. 1998) ............................................................................... 6

**Statutes**
18 U.S.C. § 844(i) ............................................................................... 7

**Rules**
Federal Rule of Evidence 403 ............................................................................... 8, 18, 19
Federal Rule of Evidence 404 ............................................................................... passim
Federal Rule of Evidence 702 ............................................................................... passim

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Defendant JONATHAN RINDERKNECHT's ("defendant") Motion in Limine No. 1 and Daubert Motion To Exclude the Opinion Testimony of Government Expert Dr. Kevin L. Kelm (the "Motion") asks the Court to bar all of Dr. Kelm's proposed testimony.  But the Motion does not address the majority of Dr. Kelm's proposed testimony, focusing instead on the smaller subset of the bases and reasons of Dr. Kelm's opinions related to defendant's history of ███████████████████████.  The government agrees that Dr. Kelm normally could not testify about those specific foundational materials for his opinions because, in the Ninth Circuit, an expert testifying about motives typically may not opine about evidence specific to the defendant.  But the Motion ignores the defense's own proposed admission of so-called "profiling" evidence as well as the litany of related statements that the defense has made regarding its trial strategy.

If this were a typical arson trial, Dr. Kelm's expert testimony would be limited to his description of the behavioral patterns and motive indicators in arson cases (i.e., with no specific opinions related to defendant himself).  Such testimony is straightforward, uncontroversial, and widely recognized as admissible because it is relevant to defendant's motive.  In a typical case, to avoid problems regarding alleged profiling evidence, Dr. Kelm would not testify about defendant, the evidence he reviewed regarding defendant, or his opinions as to whether that evidence fits into well-established behavioral profiles of arsonists.

This is not a typical arson case.  The defense has noticed an expert (Edward Nordskog) to testify about – in the defense's own words – "arson profiling."  This is as clear an example of "opening the door" as one can imagine.  As a result, even if some of Dr. Kelm's proposed testimony were characterized as profiling evidence (as explained below, much of it is not profiling evidence), the testimony would be admissible because an exception to disfavored profiling evidence applies where the defense opens the door

to such testimony.  The defense cannot have it both ways: if Mr. Nordskog is going to testify about how defendant's conduct does not fit the profile of an arsonist, Dr. Kelm must be allowed to testify on the exact same issue.

Another reason why this is an atypical case is that the defense has been transparent about its trial strategy, in statements to the media and its written and verbal statements to the Court.  The defense has stated over and over that the government's investigation of the Palisades Fire was a "fishing expedition" in search of a "scapegoat" and that the government lacks "a shred of evidence" pointing to defendant's motive and guilt.  The government anticipates that the defense will continue advancing those themes in its opening statement, its cross-examination of law enforcement witnesses, and in the defense case.  Thus, even if Mr. Nordskog does not testify, the defense almost certainly will open the door to Dr. Kelm's expanded testimony through its parallel attacks on the government's investigation.

Given the defense's unusual tactics here, and the disconnect between the Motion's requested relief (barring Dr. Kelm from testifying altogether) and the focus of the Motion (the small subset of Dr. Kelm's bases and reasons related to ███████████ ███████████████████████), this brief is structured as follows.  First, the government will explain how Dr. Kelm would testify if this were a normal arson trial, and why such testimony is admissible.  Second, the government will explain how the defense's tactics in this case are opening the door to more expansive – and admissible – testimony from Dr. Kelm.  Third, the government will explain why defendant's <u>Daubert</u> arguments fall short.

For the reasons set forth below, the Motion should be denied.

## II.   DR. KELM'S ANTICIPATED TESTIMONY IF THIS WERE A NORMAL TRIAL

### A.    The Scope of the Anticipated Testimony

The Motion focuses almost exclusively on the second report that Dr. Kelm authored in this case, which discussed his opinions regarding ████████████████

2

█████████████████████████████, and the relationship between ██████████ ████████████████████ and arson.  (See Exh. B.)

Dr. Kelm authored his first report (which the Motion barely references) in January 2026, before he and the government had learned of ████████ ███████ past.  (See Exh. A.)  ███████████████████████ approached the government in February 2026 to provide their statements and corroborating evidence. (Exhs. F at 1, G at 1.)  Based on that evidence, Dr. Kelm authored his second report in March 2026.  The second report did not alter the conclusions in the first report; instead, Dr. Kelm explained in the second report that the new evidence regarding ██████████ ██████████ confirmed the conclusions in his first report.

In the (unlikely) event that the defense does not open the door at trial to more expansive testimony from Dr. Kelm, he would testify only as to a portion of the opinions set forth in his first report.  He would not testify about defendant, or any of the opinions set forth in his second report.  Instead, Dr. Kelm would provide a framework regarding the different typologies used to understand the behavior and motives of arsonists and the indicators of such typologies.  Unlike profiling or trait theory, arson typologies describe commonalities among people who are arsonists, derived from studies and interviews of convicted arsonists.  But the typologies do not suggest that the existence of the commonalities in an individual is substantive proof that the individual committed arson.

Dr. Kelm will explain – in the hypothetical – why certain behavioral responses or circumstances are consistent with revenge- and excitement-driven arson behavior and are thus relevant in an arson investigation.  This testimony will demonstrate that each piece of evidence that the ATF agents uncovered led them down a logic- and science-based path to defendant's ultimate arrest (as opposed to the irrational, bias-driven investigation that defendant claims took place).

Specifically, Dr. Kelm will testify as follows:

- Several typologies have been developed to describe arson actions and characteristics.  The most widely used is the FBI's model.  (See Exh. A at 13.)

3

- Arsonists frequently describe their fire-setting as a strategy for asserting power, using fire as a means to influence or control aspects of their stressful environment. Arsonists may seek to obtain power or regain power that they feel they have lost. Frustration is another significant factor. A common theme among discussions with arsonists is the experience of frustration caused by adverse life events, such as the loss of employment, troubled interpersonal relationships, social isolation, rejection, or a debilitating injury or disability. Arsonists often struggle to cope with these stressors, leading to persistent feelings of frustration and a sense of helplessness over their inability to change or achieve certain goals. This frustration may escalate into anger, and fire-setting becomes a way to release the pent-up frustration and anger and regain a sense of control or emotional relief. Such themes of power, frustration, and anger are themes that cross all motive typologies for fire-setting. (See id. at 13-14.)

- The FBI's model identifies six motivational schemes – vandalism, revenge, excitement, profit, crime concealment, and extremism. Subcategories of revenge include personal, societal, institutional, and group retaliation. Subcategories of excitement include thrills, attention, and recognition as a hero. Although arsonists generally have a primary motive, other motives may be present as part of the power dynamic. (See id. at 14-15.)

- Motives can be categorized as instrumental (rational, goal-directed) or expressive (emotional). Expressive motives include revenge and excitement. (See id. at 6-7.)

- Indicators of certain motivational schemes can be observed in an arsonist's antecedent behavior, crime scene behavior, and post-offense behavior. (See id. at 16-20.)

- Antecedent behavior include interpersonal conflict; repeated feelings of abandonment, anger, rejection; social isolation; impulsive, hostile, and intrusive communications; work and financial stress; emotional coping; political and social focus; paranoia; behavioral presentation; interpersonal trust and dependence;

4

emotional volatility and mood swings; anger and threat language; struggles with identity (self-described intellectual superiority mixed with self-criticism); aggressive and controlling behavior; interest in demeaning and violent content; perceived injustice; and externalization of blame and entitlement.  (See id. at 16-18)

- Indicators of revenge- and excitement-driven arson include grievance and anger history; symbolic target selection; affective language and threats; and a simple and impulsive modus operandi (lack of sophisticated planning or tools).  (See id. at 18-19.)

- Post-offense behaviors such as lingering, watching, and returning to observe or document the fire, and calling 911, are indicators of expressive motives, such as revenge and excitement, as they offer instant emotional rewards including arousal, control, and attention.  (See id. at 19-20.)

**B.     The Anticipated Testimony Is Admissible**

The Motion does not appear to challenge the admissibility of any of the foregoing. Instead, the Motion focuses on Dr. Kelm's opinions in his second report regarding ██████ ████████.  But even if the defense does challenge the admissibility of the expert testimony outlined above, such a challenge would fail.

    1.     Legal Framework

"[M]otive is always relevant in a criminal case, even if it is not an element of the crime."  United States v. Hill, 643 F.3d 807, 843 (11th Cir. 2011) (citing United States v. Sriyuth, 98 F.3d 739, 747 n.12 (3d Cir. 1996)); United States v. Day, 591 F.2d 861, 874-75 (D.C. Cir. 1978) ("Motive is a state of mind showing the probability of appropriate ensuing action [and] it is always relevant.") (quoting 1 Wigmore on Evidence § 118 at 558, 561 (3d ed. 1940)) (cleaned up).  Evidence regarding motive, whether in the form of Rule 404(b) evidence or expert testimony, typically is admissible.

Where, as here, motive is not an element of the offense, "prior bad act evidence is allowed to show motive only when motive is in turn relevant to establish an element of

the offense that is a material issue." <u>United States v. Brown</u>, 880 F.2d 1012, 1014 (9th Cir. 1989).  For example, motive evidence is admissible to prove identity, intent, or the defendant's state of mind.  <u>Id.</u> at 1015.  Here, the government must prove that defendant acted maliciously (Counts One and Two) and willfully (Count Three).

As the Fifth Circuit has explained, in allowing extrinsic evidence of prior drug possession in a trial for drug distribution:

> [m]otive is not an ultimate issue in this case, such as an element of the criminal offense, but it is part of the story and provides context to the events in question.  By showing motive—that this defendant had a reason to commit the crime—the Government's more important purpose was to offer circumstantial evidence to support [defendant's] identity.  The prior possession is, of course, not admissible to show [defendant's] propensity to deal drugs.  Yet, extrinsic evidence of prior drug use or possession is relevant to establishing motive where the actions help establish why the defendant wanted to commit the charged offense.

<u>United States v. Kinchen</u>, 729 F.3d 466, 472 (5th Cir. 2013).

Expert testimony regarding motive is admissible.  For example, testimony from a gang expert regarding "paybacks" against rival gang members is admissible to prove the defendant's motive for assault.  <u>See</u> <u>Windham v. Merkle</u>, 163 F.3d 1092, 1103-04 (9th Cir. 1998); <u>see also</u> <u>United States v. Mejia-Luna</u>, 562 F.3d 1215, 1218-19 (9th Cir. 2009) (affirming district court's admission of expert testimony regarding alien smuggling operations in alien smuggling trial); <u>United States v. Kadir</u>, 718 F.3d 115, 122 (2d Cir. 2013) (affirming district court's admission of terrorism expert's testimony as probative of intent element of terrorism conspiracy charges).

The same holds true in arson cases.  For example, in an arson trial involving a defendant who set fire to her convenience store when she was under significant financial distress and then filed an insurance claim, the primary defense was that there was no direct evidence that the defendant caused the fire.  <u>United States v. Martin</u>, 523 F.3d 281, 289 (4th Cir. 2008).  The defendant argued that the jury convicted her "solely on the insufficient evidentiary basis of her motive to torch the building and her presence at the

building near the time of the fire." Id. The Fourth Circuit rejected the defendant's claim and explained that "[w]hen the government offers evidence of the defendant's 'motives to set the fire, his plan and preparation to do so, his opportunity to carry out the plan and evidence that [the fire did not occur] accidentally,' direct evidence of arson is not necessary to sustain a conviction under § 844(i)." Id. (quoting United States v. Lundy, 809 F.2d 392, 396 (7th Cir. 1987), and citing United States v. Schnapp, 322 F.3d 564, 572-73 (8th Cir. 2003)).

### 2. The Testimony Is Admissible

Dr. Kelm's proposed testimony fits within the foregoing framework for motive evidence. His testimony that there are several accepted types of arson motives, including revenge- and excitement-driven arson, is necessary for the jury to understand and evaluate the potential motives at issue here (just as a gang expert's testimony is necessary for the jury to understand a gang member's behavior). Without a framework to understand defendant's motives and behaviors, the jury will be left to draw their own uninformed conclusions about his conduct in this case.

Dr. Kelm's analysis and methodologies are not controversial. Mr. Nordskog, the defense expert who will testify about "arson profiling," agrees that anger/revenge arson is one of the two most common types of arson (the other being financial/profit arson).[1] Excitement- and revenge-based arsons are also included as established motives by the FBI.[2]

None of this is so-called "profiling" evidence. The government is not arguing, and Dr. Kelm will not testify, that defendant "fits the profile" of an arsonist (except under the circumstances set forth in Part III, infra). Instead, Dr. Kelm will describe the arson-behavior analysis framework and discuss the various factors and indicators

---

[1] See, e.g., Mr. Nordskog's interview at https://www.youtube.com/watch?v=BG5cirFVKiQ. Mr. Nordskog's well-known book is entitled, "The Arsonist Profiles: Analyzing Arson Motives and Behavior."

[2] https://www.ojp.gov/ncjrs/virtual-library/abstracts/motive-based-offender-profiles-arson-and-fire-related-crimes

7

relevant to that framework so that jurors can draw their own conclusions regarding defendant's motives. The testimony outlined above falls within the bounds of Rules 702, 404, 403, and the applicable case law.

The Motion claims that Dr. Kelm's opinions about defendant as set forth in his first report are a "backdoor attempt at introducing" Rule 404(b) evidence. (Mtn. at 18:11-13.) None of Dr. Kelm's testimony as outlined above involves any Rule 404(b) evidence; the proposed testimony does not discuss defendant or any of his prior acts. As set forth below, however, the government anticipates that the defense will open the door to Dr. Kelm testifying about defendant's prior acts. This would not be a "backdoor attempt" to introduce evidence but rather a direct response to the defense's trial strategy.

## III. DR. KELM'S BROADER ANTICIPATED TESTIMONY GIVEN THE DEFENSE STRATEGY HERE

As noted above, this is an atypical arson case because the defense has (1) noticed an expert on arson profiling, and (2) relentlessly attacked the government's investigation, the investigators themselves, and the purported lack of evidence supporting the charges. Accordingly, assuming the defense continues with this approach at trial, more expansive testimony from Dr. Kelm will be admissible.

The more expansive testimony will include the other opinions set forth in Dr. Kelm's first report, i.e., where Dr. Kelm discusses the evidence regarding defendant and his opinions about that evidence. (See Exh. A at 16-20.) Depending on the audacity of the defense's tactics at trial, the more expansive testimony also could include the opinions referenced in Dr. Kelm's second report about ███████████████ ██████ ████████████████████ (which are the focus of the Motion). (See Exh. B.)

### A. The Anticipated Defense

#### 1. Mr. Nordskog's Expert Testimony

Defendant provided notice that Mr. Nordskog will testify as an expert in "arson profiling." (Exh. E at 1.) Mr. Nordskog will describe his expertise and experience in investigative psychology, a specialty centered around examining crime scene behavior to

8

assist in identifying and classifying a suspect. (Id. at 7.) Mr. Nordskog will criticize the case agents for vilifying normal traits in a person as "something an arsonist might do, such as standing around a fire and taking photos." (Id. at 8.) He will also testify to the following:

- When defendant stayed at the scene of the Lachman Fire, called 911, and allegedly offered to help firefighters during the fire, his behavior was inconsistent with that of an arsonist and instead commonly "done by citizens on nearly every fire." (Id.)

- "Defendant has no known history of the more unique traits associated with other firesetters" and "has no criminal history, no institutional history, no serious mental or emotional health history, no history of theft, no known interest in firefighting, no known desire to be a 'hero.' No online presence related to these issues, no known association to any extremist groups, arson, bombing, or serious anti-government or anti-society groups." (Id.)

- Defendant carried a lighter with him on his walk up the hillside just before the fire because he is a smoker. (Id. at 9.)

- When defendant filmed the Lachman Fire, created and saved dystopian images of wildfires, expressed emotional, interpersonal, and financial issues preceding and following the Lachman Fire, and physically exhibited stress symptoms during an interview about the fire, his conduct was "normal young male behavior." (Id. at 9.)

- There is no evidence of intent or motive in this case and "none of [the evidence] indicates he is an arsonist." (Id. at 7-9.)

      2.    The Attacks of the Criminal Investigation and Investigators

The statements referenced above from Mr. Nordskog mirror the defense's public relations strategy and litigation strategy thus far. In statements to the media and the Court, the defense has argued that defendant was in the wrong place at the wrong time, and that the government is pinning the criminal case on him without a "shred of

evidence."  The assertion that defendant is simply a "scapegoat" to cover up alleged governmental failures has been the defense's principal soundbite.  In a parallel effort, the defense has maligned the government's case agents as prejudiced.  For example:

- Defendant's second Motion to Suppress argued that the government's search warrants were a "fishing expedition," and defendant argued during oral argument that "no evidence of a crime" was found in the search warrant returns.  (Dkt. No. 83 at 9; Dkt. No. 101.)

- At the hearing on defendant's second Motion to Suppress, the defense claimed that one of the two case agents, ATF Special Agent Michael Montevidoni, repeatedly misled magistrate judges across the country by misrepresenting the facts underlying the investigation.  (Dkt. No. 101.)

- In defendant's Motion in Limine To Admit Evidence of ATF Special Agent Matthew Beals' Prior Investigation and Testimony in the USS Bonhomme Richard Arson Investigation, defendant claims that the other case agent, ATF Special Agent Matthew Beals, has a motive and scheme to reach a conclusion regardless of what the evidence showed.  (Dkt. No. 76 at 10-11.)  The defense argues that Special Agent Beals constructed a motive narrative around defendant without evidence and was driven by a "motive to attribute the fire to an individual" and "deflect institutional liability."  (Id. at 11, 13.)

- Mr. Nordskog's expert notice calls the government's investigative techniques "antiquated" and the motive theory "lame," and disparages Special Agent Beals based on false claims about the USS Bonhomme Richard case.  (Id. at 9-10.)

- Mr. Nordskog's expert notice concludes that the government is trying to "pin the whole thing on a person who was in the area at the time of the event."  (Id. at 10.)

If permitted, the defense will continue introducing these inflammatory and misleading themes throughout trial.

10

**B.     Because of the Anticipated Defense, a Broader Range of Testimony from Dr. Kelm Is Admissible**

Assuming that the defense continues its attacks on the government's investigation at trial, more expansive testimony from Dr. Kelm will be admissible.  While such testimony normally might be characterized as impermissible "profiling" evidence, that will not be the case here given the defense's choreographed tactics.

In the Ninth Circuit, although it is not per se inadmissible, "profiling" evidence (i.e., evidence that certain characteristics are common to individuals who commit particular crimes) is disfavored as substantive evidence of a defendant's guilt.  See United States v. Wells, 879 F.3d 900, 922 (9th Cir. 2018).  However, such evidence is permitted in certain circumstances, including as (1) rebuttal evidence, when a defendant "opens the doors" by introducing potentially misleading testimony, and (2) background evidence.  Id. at 921.  Both exceptions likely will apply here.

1.     The Defense Is "Opening the Door"

Dr. Kelm's testimony is admissible under the doctrine of curative admissibility because defendant is opening the door to this evidence.  The Ninth Circuit approves the introduction of otherwise excludable testimony when the defendant opens the door by introducing potentially misleading testimony.  See e.g., United States v. Beltran-Rios, 878 F.2d 1208, 1212 (9th Cir. 1989) (discussed below); United States v. Segall, 833 F.2d 144, 148 (9th Cir. 1987) (district court did not abuse its discretion in allowing testimony from a government witness on redirect where defense counsel "opened the door" to the testimony by creating a misleading impression during cross-examination); United States v. Giese, 597 F.2d 1170, 1188-90 (9th Cir.), cert. denied, 444 U.S. 979 (1979) (defense testimony relating to 18 books owned and read by defendant suggesting his left-wing but non-violent, non-revolutionary political views "opened the door" to cross-examination on other books defendant had sold, owned or read).

This type of permissible rebuttal testimony allows the government to respond to a defendant's attempts to suggest innocence based on the defendant's particular

11

characteristics.  For example, in <u>Beltran-Rios</u>, the defense opened the door by suggesting that the defendant's lack of accoutrements of wealth was proof that he was not part of a smuggling operation; the government was entitled to rebut the inference by presenting evidence of characteristics typical of drug couriers.  878 F.2d at 1212.  In its analysis, the Ninth Circuit found the Second Circuit's decision in <u>United States v. Khan</u>, 787 F.2d 28 (2d Cir. 1986) most closely on point.  <u>Id.</u>  In <u>Khan</u>, the Second Circuit found that expert testimony was relevant to rebut the defendant's argument that as a poor man he could not be a major drug dealer, including expert testimony about common practices and dress or appearance of heroin dealers in Pakistan.  787 F.2d at 34.  Similarly, here defendant has put his history and characteristics at issue, claiming that nothing in his history or character is consistent with an arsonist and that his antecedent and post-offense behavior was consistent with that of an innocent, normal, young male.  (Exh. E at 7-9.)  Dr. Kelm will refute these claims.

By noticing Mr. Nordskog's profiling testimony, defendant has embedded the potential for a misleading impression about his history and character into this case.  In addition, the defense is likely to further open the door during trial (and before the defense case) when it (1) cross-examines the case agents about defendant's allegedly innocent behavior, and (2) suggests (falsely) that the evidence discovered during the investigation was not meaningfully significant in an arson case.  As a result, although "opening the door" is more often applicable to rebuttal, the government seeks to introduce Dr. Kelm's testimony in its case-in-chief.  Where, as here, the misleading evidence is a part of a defendant's theory that will be presented to the jury, delaying admission until the rebuttal would confuse the jury and exacerbate, rather than cure, the prejudice.

As a result, Dr. Kelm's testimony is admissible not as substantive evidence of defendant's guilt, but instead to respond to the defense's inaccurate portrayals of defendant and the ATF case agents.

12

## 2. Background Evidence

In addition, and in the alternative, Dr. Kelm's testimony is necessary background information for the jury to assess and evaluate the investigators and their investigation. See, e.g., United States v. Gomez-Norena, 908 F.2d 497, 501 (9th Cir. 1990) (admitting courier profile and general modus operandi evidence to "provide the jury with a full and accurate portrayal of the events as they unfolded" on the afternoon of the incident). Defendant has excoriated the case agents as biased hacks who unfairly targeted him despite a supposed lack of evidence. The defense wants to isolate the evidence uncovered during the investigation from its context, in order to argue that the case agents targeted defendant as a "scapegoat" to distract from the alleged cover-up of governmental failures regarding the Palisades Fire. For example, the defense asserts that "the scapegoating and politically motivated finger pointing to the [defendant] … is arguably one of the most shameful attempts at deflecting civil and criminal responsibility in the nation's history." (Dkt. No. 49 at 16; Dkt. No. 83 at 21.)

This defense theory highlights the need for Dr. Kelm to testify about a behavioral framework through which jurors can assess the relevance of certain factors in an arson investigation and decide for themselves whether the case agents followed logic and science-based reasoning. Devoid of such background, the jury may be left with the misimpression that the case agents were overzealous, misguided, and prejudiced, a narrative that the defense has been peddling since defendant's arrest. Excluding Dr. Kelm's testimony would deprive the jury of the information necessary to assess the investigation and the credibility of the law enforcement witnesses.

If the Court is concerned there is a risk that the jury may consider the testimony as substantive evidence of defendant's guilt, the Court may give a limiting instruction that the evidence may only be considered as background material. See Gomez-Norena, 908 F.2d at 501 (profile testimony for this limited purpose and the district judge's caution to the jury greatly reduced the potential for unfair prejudice).

## IV.  DR. KELM'S TESTIMONY IS RELIABLE AND HELPFUL

### A.  Legal Framework

The admission of scientific evidence is governed by Federal Rule of Evidence 702 and the standards set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In Daubert and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court announced the district court's role as "gatekeeper" and entrusted the court with discretion to ensure that "all experts," not merely "scientific" ones, pass scrutiny under Rule 702.  Id. at 148.  The district court's function is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S. at 152.  Daubert teaches that, to withstand scrutiny under Rule 702, expert testimony must be both reliable and helpful.  509 U.S. at 589.  For expert testimony to be reliable, the district court must look not at "the correctness of the expert's conclusions but the soundness of his methodology."  Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1318 (9th Cir. 1995) ("Daubert II").  Reliable expert testimony also must be helpful.  See Daubert, 509 U.S. at 591 (expert testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful"); Moore v. Ashland Chem., Inc., 151 F.3d 269, 276 (5th Cir. 1998) (noting that the party offering the challenged expert opinions need not prove "that the expert's testimony is correct").

"A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." Mukhtar v. Cal. State Univ., 299 F.3d 1053, 1064 (9th Cir. 2002).  The general approach

14

is to allow expert testimony to proceed if it would be helpful to the trier of fact.  See Fed. R. Evid. 702, Advisory Committee Notes (2000) (noting "rejection of expert testimony is the exception rather than the rule").  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.

### B.     Dr. Kelm's Testimony Is Reliable

Dr. Kelm is qualified to testify as an expert on arson investigations and criminal investigative analysis, including the analysis and classification of behavioral patterns and motivational factors in arson cases.  He has experience as an ATF investigator, Certified Fire Investigator, and certified explosives specialist and as a criminal profiler at the FBI Behavioral Analysis Unit.  (See Exh. A at 2.)  His educational background includes a Ph.D., M.S., and B.S. in criminal justice with his Ph.D. dissertation and M.S. thesis on serial arson behaviors and classifying bomber characteristics using crime scene indicators, respectively.  (See id.)  He has earned awards, honors, certifications, and fellowships.  (See id. at 4.)  He has authored numerous publications on behavioral investigations of arsonists and related and has testified as an expert witness in federal and state courts across the country.  (See id. at 4-5.)

Dr. Kelm's "reasoning or methodology underlying the testimony is scientifically valid."  Daubert, 509 U.S. at 580.  In his first report, Dr. Kelm explains the bases for his reasoning and his methodology, beginning with the definition of "motive" and the various motivational typologies of arsonists derived from early studies of arsonists confined to psychiatric institutions, and then describing the development of such foundational studies to the current FBI model.  Throughout both of his reports, Dr. Kelm cites the specific psychological studies that support his reasoning and methodology. (See Exh. A at 12-14; Exh. B at 3-6, 10-21.)  These studies and the framework Dr. Kelm applied in this case are generally accepted in the relevant scientific community and employ "the same level of intellectual rigor that characterizes the practice of an expert in

15

the relevant field." Kumho Tire, 526 U.S. at 152.  Dr. Kelm's research includes interviewing arsonists as part of an ongoing study of serial arsonists initiated by the National Center for the Analysis of Violent Crime in 1990.  (See Exh. A at 5.)  Cf. United States v. Halamek, 5 F.4th 1081, 1088 (9th Cir. 2021) (finding that "[e]xtensive experience interviewing victims can qualify a person to testify about the relationships those victims tend to have with their abusers").  The defense's expert, Mr. Nordskog, applies the same or substantially same typologies, such as revenge, taken from the FBI's model of typologies to understand arson cases.[3]

Despite making the sweeping claim that Dr. Kelm's testimony should be excluded altogether, the Motion focuses almost exclusively on Dr. Kelm's methodology as it relates to ███████████████████████████████████ ██████████████████████████████  Dr. Kelm cites the studies, articles, and books that support the applicability of the same underlying psychological forces behind ████ and arson behavior.  (Exhs. B at 3-6, 10-21, C at 1-2, 4-5, 7, and D at 2.)  Dr. Kelm employed the Structured Professional Judgment ("SPJ") methodology to reach his opinion.  (Decl. Dr. Kevin L. Kelm ¶ 2; Exh. C at 1.)  He analyzed extensive studies and literature on ████ (as cited throughout his report), created a matrix of the underlying psychological forces, and compared the matrix to that of expressive revenge and anger-driven arson for overlapping factors.  (Decl. Dr. Kevin L. Kelm ¶ 3-6; Exhs. C, D.) This methodology is centered around structured data collection and analysis that can be replicated and tested. (Decl. Dr. Kevin L. Kelm ¶ 2; Exh. C at 1.)  It is commonly used in the field of threat and violence risk assessment and is widely encouraged by forensic psychologists in lieu of unstructured clinical judgment that may be more prone to evaluator bias.  (Id.)  Dr. Kelm's testimony regarding his analysis is reliable and methodology generally accepted. The defense expert, Mr. Nordskog, has spoken and written about his own methodology to obtain insight from an arsonist's history of ████████████████████████,

---

[3] See, e.g., https://www.youtube.com/watch?v=BG5cirFVKiQ at 0:21-0:24.

███████████████████████.[4]

Dr. Kelm's reasoning and methodology can be properly applied to the facts in issue. See Daubert, 509 U.S. at 580. Dr. Kelm reviewed the extensive case file, including, among other things, defendant's ChatGPT history; digital evidence from his phones; his communications with family and friends; interviews with witnesses from the night of the fire, and defendant's family, former friends, associates, and ex-girlfriends; and evidence corroborating his ex-girlfriends' statements ████████████████. (Exh. B at 1, C at 2.) The evidence that Dr. Kelm reviewed detailed defendant's life leading up the fire (such as the financial constraints and interpersonal stressors and defendant's responses to them) as well as defendant's history from months to years before.

The Motion points to Dr. Kelm's access to information about defendant's early life to argue that his testimony would be unreliable (Mtn. at 12) when, in fact, that demonstrates the breadth of information Dr. Kelm considered so as to not cherry-pick facts. And contrary to defendant's repetitive claims that ████████████ statements are unverified and unreliable, their statements are corroborated by contemporaneous ███████████████████████████████████████████ ██████, among other things, all of which Dr. Kelm reviewed. (Exh. B at 1, C at 2.) (Defendant's claim that Dr. Kelm had to personally interview ████████████████ has no legal support.) Exhibits F and G, which have been filed under seal with the Court, are reports documenting the details and corroborating evidence that were provided to Dr. Kelm; despite its indignant bombast, the Motion fails to address any of the corroborating evidence.

To the extent that defendant wishes to challenge the underlying evidence that Dr. Kelm reviewed, the defense is free to do so via cross-examination. A trial court is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions

---

[4] See, e.g., https://www.youtube.com/watch?v=BG5cirFVKiQ at 1:43-1:45.

17

merely because they are impeachable." Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc., 738 F.3d 960, 969 (9th Cir. 2013).

### C. Dr. Kelm's Testimony Will Be Helpful to the Jury

Dr. Kelm's proposed testimony will be helpful to the jury for at least two reasons. First, his testimony will provide the jury with a framework for understanding the investigators' steps in this case, particularly where they were informed by patterns of arsonist behavior and relevant indicators not within the common knowledge of laypersons. Rule 702 permits expert testimony where specialized knowledge will assist the trier of fact, and the Ninth Circuit recognizes the value of such testimony in explaining investigative techniques and behavioral patterns. See e.g., Gomez-Norena, 908 F.2d at 501; Beltran-Rios, 878 F.2d at 1212. Dr. Kelm will explain how behavioral indicators, motive development, and post-incident conduct were relevant to the investigation, thereby helping the jury assess the reasonableness of the investigators' actions.

Second, Dr. Kelm will provide background and context to rebut the defense's assertion that defendant's history and behavior are inconsistent with that of an arsonist. By placing those factors in the broader context of established behavioral patterns among arsonists, Dr. Kelm will help the jury determine whether the defense's claims are persuasive or misleading. The defense has conceded the helpfulness of such testimony by disclosing that Mr. Nordskog will opine on the same issues.

### D. Dr. Kelm's Testimony Is Not Barred by Rule 404 or Rule 403

Dr. Kelm's testimony will not be provided to the jury as substantive proof of defendant's guilt (i.e., it is not evidence of defendant's character to prove that on January 1, 2025, he acted in accordance with that character). Instead, the testimony will be offered to rebut the defense's evidence and arguments about defendant's character, an exception to the general prohibition against character evidence. See Fed. R. Evid. 404(a)(2)(A).

18

The Motion focuses almost exclusively on the prejudicial impact of ██████████ ████████████████████████████████████████████. The government concedes that ████████████████████ is more prejudicial than the other topics of Dr. Kelm's testimony; with one exception, the government is not seeking to introduce ████████████████████████████████████████ in its case-in-chief.[5] If the Court has Rule 403 concerns, and depending on the defense's tactics at trial, the government would be amenable to a compromise such as Dr. Kelm testifying that learning about ████████████████████████████████████ ████████████ confirmed his preexisting opinions about defendant's motive. Again, if the Court finds there is some lingering risk of prejudice to defendant, it may give a limiting instruction. See Gomez-Norena, 908 F.2d at 501 n.3 ("it is our responsibility to presume that a jury follows clear instructions") (citations omitted).

\*   \*   \*

In sum, Dr. Kelm's testimony is based on "scientific, technical, or other specialized knowledge," and will "assist the trier of fact to understand the evidence or to determine a fact in issue." Stilwell v. Smith & Nephew, Inc., 482 F.3d 1187, 1191-92 (9th Cir. 2007) (quoting Fed. R. Evid. 702)). As such, it may be admitted under Rule 702, and defendant can challenge it at trial through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . ." Daubert, 509 U.S. at 596.

## V.   THERE IS NO NEED FOR A DAUBERT HEARING

In limine briefing and argument, followed by voir dire and cross-examination at trial, are adequate gatekeeping without a Daubert hearing. See United States v. Alatorre, 222 F.3d 1098, 1102-05 (9th Cir. 2000). Denying a Daubert hearing is within the Court's "broad latitude" in structuring reliability determinations. United States v. Holguin, 51 F.4th 841, 852 (9th Cir. 2022). Defendant identifies a series of questions he

---

[5] The exception, as set forth in the government's Rule 404(b) motion, is when defendant instructed one of his ex-girlfriends to film the Woolsey Fire.

19

seeks a hearing to resolve (Mtn. at 13), but every single one of them pertains to the interplay between █████ and arson behavior, rather than the bulk of Dr. Kelm's likely testimony.  Dr. Kelm's declaration and methodology appendix (Exh. C) explain his methodology and reports (Exhs. A, B); along with his "Cross-Walk Table" of relevant indicators (Exh. D), they contain thorough citations to support his bases, reasoning, and conclusions and are sufficient to establish the reliability of his testimony without a Daubert hearing.

## VI.   CONCLUSION

For the aforementioned reasons, the government respectfully requests that the Court deny defendant's motion.