Steven Haney Esq., *Pro Hac Vice*
Haney Law Group, PLLC
22815 Kelly Rd.
Eastpointe, MI 48021
Telephone: (248) 414-1470
E-Mail: steve@haneygroup.net

Attorneys for Defendant

Jacob A. Gillick, Esq., SBN 312336
Gillick Legal, APC
777 S. Alameda, 2nd Floor
Los Angeles, CA 90021
Telephone: (858) 250-0656
E-Mail: JGillick@GillickLegal.com

Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN RINDERKNECHT<br><br>Defendant. | Case No. 2:25-cr-00833-AH<br><br>**DEFENDANT'S SUPPLEMENTAL BRIEF RE: PROXIMATE CAUSE AS IT RELATES TO: DESTRUCTION OF PROPERTY BY MEANS OF FIRE (18 U.S.C. § 844(f)(1)); ARSON AFFECTING PROPERTY USED IN INTERSTATE COMMERCE (18 U.S.C. § 844(i)); AND TIMBER SET AFIRE (18 U.S.C. § 1855) AND REQUEST FOR SPECIAL JURY INSTRUCTIONS**<br><br>Hon. Anne Hwang<br>Hearing: May 13, 2026<br>Trial: June 9, 2026 |

i

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 01

I.  PROXIMATE CAUSE IS INTENDED IN  EACH SUBSTANTIVE ARSON COUNT ...... 04

    A.  THE TEXT OF EACH CHARGING STATUTE REQUIRES A CAUSAL RELATIONSHIP BETWEEN THE DEFENDANT'S ACT AND THE PROPERTY DESTROYED .................................................................................................... 04

    B.  THE SUPREME COURT AND THE NINTH CIRCUIT HAVE REPEATEDLY IMPORTED COMMON-LAW CAUSATION PRINCIPLES INTO FEDERAL CRIMINAL STATUTES ................................................................................ 05

    C.  THE GOVERNMENT'S THEORY MAKES PROXIMATE CAUSE THE CENTRAL ISSUE IN THIS CASE ...................................................................... 08

    D.  THE GOVERNMENT'S OWN CONTEMPORANEOUS INVESTIGATION TREATED THE PALISADES FIRE AS AN INDEPENDENT ARSON EVENT - NOT A HOLDOVER FROM THE LACHMAN FIRE ......................................... 10

II.  ANY SENTENCING ENHANCEMENT TIED TO THE PROPERTY LOSS RESULTING FROM THE PALISADES FIRE REQUIRES THE GOVERNMENT TO PROVE BOTH BUT-FOR AND PROXIMATE CAUSATION UNDER BINDING NINTH CIRCUIT LAW................................................................................................................. 11

    A.  THE NINTH CIRCUIT HAS CONSISTENTLY REQUIRED BOTH BUT-FOR AND PROXIMATE CAUSATION TO ESTABLISH LOSS AMOUNTS FOR SENTENCING................................................................................................. 12

III.  THE § 844(i) INTERSTATE-COMMERCE NEXUS AND THE § 1855 FEDERAL-LAND REQUIREMENT ARE ELEMENTS THE GOVERNMENT MUST PROVE TO THE JURY ....................................................................................................... 13

    A.  COUNT THREE (§ 1855) FAILS BECAUSE THE LACHMAN FIRE WAS ALLEGEDLY SET ON NON-FEDERAL LAND AND DID NOT DAMAGE OR DESTROY ANY FEDERAL PROPERTY ........................................................... 15

    B.  COUNT TWO (§ 844(i)) ALSO FAILS BECAUSE EIGHT ACRES OF STATE-PARK BRUSH IS NOT "PROPERTY USED IN INTERSTATE COMMERCE.".16

    C.  THE COURT SHOULD ADOPT A SET OF SPECIAL JURY INSTRUCTIONS ADDRESSING THE POSSIBLE FACTUAL OUTCOMES THE JURY MAY REACH ...................................................................................................... 17

IV.  CONCLUSION.................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

*Burrage v. United States*, 571 U.S. 204 (2014) ............................................................................ 5

*Jones v. United States*, 529 U.S. 848 (2000) ................................................................................. 4

*Mathews v. United States*, 485 U.S. 58 (1988) ............................................................................. 9

*Paroline v. United States*, 572 U.S. 434 (2014) ........................................................................... 7

*United States v. Berger*, 587 F.3d 1038 (9th Cir. 2009) ............................................................... 3

*United States v. Geiger*, 263 F.3d 1034 (9th Cir. 2001) ......................................................... 14,16

*United States v. George*, 949 F.3d 1181 (9th Cir. 2020) ....................................................... 3,12,13

*United States v. Grant*, 318 F. Supp. 2d 1042 (D. Mont. 2004) ................................................. 4,5

*United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000) ......................................................... 3,8,12,13

*United States v. Main*, 113 F.3d 1046 (9th Cir. 1997) ............................................................... 6,7,8

*United States v. Pappadopoulos*, 64 F.3d 522 (9th Cir. 1995) .................................................... 16

*United States v. Pineda-Doval*, 614 F.3d 1019 (9th Cir. 2010) .................................................... 7

*United States v. Reed*, 147 F.3d 1178 (9th Cir. 1998) ................................................................. 17

*United States v. Warr*, 530 F.3d 1152 (9th Cir. 2008) ................................................................ 13

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. IV, § 3, cl. 2 ........................................................................................................ 18

## STATUTES

18 U.S.C. § 844(f)(1) ...................................................................................................................... 4

18 U.S.C. § 844(i) .................................................................................................................. 1,2,4,7,11

18 U.S.C. § 1112 .............................................................................................................................. 7

18 U.S.C. § 1855 .................................................................................................................... 1,2,5,8

18 U.S.C. § 3231 ............................................................................................................................ 14

## OTHER AUTHORITIES

U.S. Sentencing Guidelines Manual § 1B1.3(a)(3) ....................................................................... 11

**INTRODUCTION**

The Government's theory of prosecution presumptively merges two distinctly separate fires that occurred six days apart. Whether they are right, or wrong, such conclusory proclamations need to be supported by the facts and evidence presented to the jury. The Government also must explain if such facts are so obvious, why then did the Government themselves initially investigate the Palisades Fire as an entirely separate fire event they believed was caused by an arsonist?

The reality is that the Government now seeks to characterize the Palisades Fire as a single 7 day fire event, which started on state park land because they realize the only way they can confer Federal Court jurisdiction upon the Defendant, for two of the three charges in the indictment, is by attributing to the Defendant the federal property damage from the Palisades Fire.

This is an attribution which facially seems unfair because the Defendant was never accused of setting the Palisades Fire, or being anywhere near the Palisades when the January 7th, 2025 fire occurred. Perhaps a juror would have an issue with this fact, perhaps not, but all defenses should be presented and all evidence should be considered and granted their proper weight. The Government needs to prove their case without facts being assumed.

As the Court is aware, the Lachman Fire ignited just after midnight on January 1, 2025, and was declared suppressed by the Los Angeles Fire Department within hours. In no manner has the Defense stipulated to the fact the Defendant started the Lachman Fire and maintains any proof that he did is void of any direct evidence, and contrary to common sense and logic. Trial evidence will show the Defendant called 911 twelve times in five minutes to report the fire, including his first call to 911 within seconds of the fire being observed on a nearby trail camera.

The Lachman Fire burned approximately eight acres of **non-federal** coastal vegetation/brush and never burned any federal property, or any property that affected Interstate Commerce, which are statutory elements of both Section 844(i) and Section 1855. Simply put, without treating the Palisades Fire as a continuing event, the Government could not prove the federal elements of these two charges. The authority for that proposition is noted below.

The Palisades Fire ignited mid-morning on January 7, 2025 in the general, but disputed origin area, of where the Lachman Fire started and during a six day window the LAFD, California

1

State Parks, and the Mountains Recreation and Conservation Authority took no further suppression action. Unlike the Lachman Fire, the Palisades Fire burned more than 23,000 acres of property, including Federal property either owned or leased to the United States and caused an estimated $50 billion in property damage. Unlike the Lachman Fire, the Palisades Fire, destroyed property undeniably affecting interstate commerce. Important distinctions from the Lachman Fire.

Though now proclaimed by the Government to be a "holdover fire", which reignited six days after the January 1st, 2025 Lachman Fire, the Palisades Fire was originally investigated by the Government as arson. This is evidenced by an immediate arson investigation, and the ATF executing search warrants of the suspects they believed started the fire the morning of January 7th, 2025.  Those search warrants have been produced in discovery and clearly indicated arson targets who it was believed set the Palisades Fire. **(Ex. A - Search Warrant Palisades Arson Suspect).**

There is no dispute that each of the counts against the Defendant—Destruction of Property by Means of Fire (18 U.S.C. § 844(f)(1)), Arson Affecting Property Used in Interstate Commerce (18 U.S.C. § 844(i)), and Timber Set Afire (18 U.S.C. § 1855)—require the Government to prove to a jury beyond a reasonable doubt the causal connection between the Defendant's overt actions, which would be here the **act** of maliciously starting a fire, and the **causal effect**, which would be here of damaging and destroying property. What the Government ignores is the causal relationship between the Defendant's alleged act and the necessary harm the statute requires the Government prove.

Neither the charges of 1) Arson Affecting Property Used in Interstate Commerce (18 U.S.C. § 844(i)), and 2) Timber Set Afire (18 U.S.C. § 1855) can stand on the Lachman Fire alone and in fact fail for want of proof of their federal elements if they do. Thus the reason the Government wants general acceptance that two fires were actually just one fire event.

The Defense advances proximate-cause and superseding-cause arguments in the alternative. The Government has the burden of proof of establishing a nexus between the Defendant and the Palisades Fire, a conclusion the Government's own contemporaneous investigators initially rebuked when they obtained federal search warrants on suspected Palisades

2

arsonists, who had no connection to the Defendant.   But when the trail went cold, eight months later the nexus was claimed and the Defendant was charged.

Alternatively, even if the jury ends up adopting the Government's holdover theory, which it took a full 8 months to conclude, the independent and intervening negligence of LAFD and California State Parks during the six-day interval arguably breaks the chain of causation as a matter of law. Either theory leads to the same legal conclusion: Mr. Rinderknecht did not proximately cause the Palisades Fire damages and for sentencing purposes should not be attributed to the estimated $50 billion of property damage and the catastrophic accompanying prison sentence.

The Defense contends and submits the following four propositions:

**First**, proximate causation is required of each substantive count. The Government must prove beyond a reasonable doubt not only that Mr. Rinderknecht started the Lachman Fire with the requisite malice and intent, but that his alleged act was both the but-for and the proximate cause of the estimated $50 Billion of property damage charged in the indictment, which the Government attributed solely to the fire he is not even accused of setting; the Palisades Fire, not the Lachman Fire.

**Second**, any sentencing enhancement the Government is certain to seek under the United States Sentencing Guidelines based on the property loss caused by the Palisades Fire — forecasts the Government seeking a historically high loss-amount enhancement and a proportionately historically high sentence for federal arson crimes.  And based on the controlling authority in the 9th Circuit, there is no question that seeking decades in prison based on that sentencing enhancement requires the Government to prove that the Defendant's alleged ignition of the Lachman Fire was both the but-for **and the proximate cause** of the Palisades Fire damages. *United States v. Hicks*, 217 F.3d 1038, 1048–49 (9th Cir. 2000); *United States v. Berger*, 587 F.3d 1038, 1048 (9th Cir. 2009); *United States v. George*, 949 F.3d 1181, 1187–88 (9th Cir. 2020). Certainly, no Guidelines loss enhancement may be calculated against the Defendant for 8 acres of exclusively state land bushes lying purely on a state park that had nominal, if any, monetary property value or loss.

**Third**, if the jury finds Mr. Rinderknecht responsible for the Lachman Fire but not the Palisades Fire, the Government will have failed to prove an essential element of two of the three charges, and the jury must acquit on those counts:

Count Two (§ 844(i)) fails because eight acres of state-park brush is not "property used in interstate commerce or in any activity affecting interstate commerce" within the meaning of *Jones v. United States*, 529 U.S. 848 (2000); and

Count Three (§ 1855) fails because the Lachman Fire was set on non-federal land and never burned federal land, and *United States v. Grant*, 318 F. Supp. 2d 1042 (D. Mont. 2004), holds on directly analogous facts that § 1855 confers no federal jurisdiction in those circumstances.

**Fourth**, a special verdict form should be adopted so that each of these questions is presented cleanly for the Court's evaluation in the event the jury splits the verdict. Based on the evidence they may, or they may not, but the Government bears the burden of proving this case without the assistance of any fact stipulations, and without presumptions of how and what happened.

# I. PROXIMATE CAUSE IS INTENDED IN  EACH SUBSTANTIVE ARSON COUNT

## A.  THE TEXT OF EACH CHARGING STATUTE REQUIRES A CAUSAL RELATIONSHIP BETWEEN THE DEFENDANT'S ACT AND THE PROPERTY DESTROYED

Destruction of Property by Means of Fire (18 U.S.C. § 844(f)(1)) - reaches anyone who "maliciously damages or destroys . . . by means of fire" property "**owned or possessed by, or leased** to, the United States."

Arson Affecting Property Used in Interstate Commerce (18 U.S.C. § 844(i)) - reaches anyone who "maliciously damages or destroys . . . by means of fire" any "building, vehicle, or other **real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.**"

Timber Set Afire (18 U.S.C. § 1855) reaches anyone who "willfully and without authority, sets on fire" inflammable material "upon the public domain or upon any lands owned or leased

4

by . . . the United States."

Section 1855 does not, and cannot, include fires set on state land, which do not burn federal property and without proof of that federal element, such as with the stand-alone Lachman Fire, the Section 1855 offense is not made out. *United States v. Grant*, 318 F. Supp. 2d 1042 (D. Mont. 2004) (Molloy, J.)  A case that factually has no distinction to the case before the Court.

Here, as charged, each statute punishes, and as importantly assesses penalty, based on the *damage to or destruction of* property—not the mere ignition of a fire. Therefore, because the charging language necessarily incorporates a causal element, the Government must prove that the Defendant committed the act to the charged property.

### B. THE SUPREME COURT AND THE NINTH CIRCUIT HAVE REPEATEDLY IMPORTED COMMON-LAW CAUSATION PRINCIPLES INTO FEDERAL CRIMINAL STATUTES

The law has long considered causation a hybrid concept, consisting of two constituent parts: actual cause and legal cause. When a crime requires not merely conduct **but also a specified result of conduct,** a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the "legal" cause (often called the "proximate cause") of the result. *Burrage v. United States*, 571 U.S. 204, 210.   Federal Arson is a crime that does not merely require an act of conduct, it also requires a specified result of conduct, which in this instance is the damage and destruction of property based on the Defendant's acts.  There can be no other interpretation.

Though not specifically stated in the federal arson statutes, few criminal statutes could better exemplify the intent of this controlling authority and its progeny.  Arson is a crime that requires an act, setting a fire, and a causal injurious effect, damaging or destroying property, which in this case is a staggering amount of injury being attributed to the Defendant. For the crime of arson, the specified result of the act of illegally setting a fire is the subsequent damage or destruction to the property.  There can be no alternate way of evaluating the cause and effect nature of the federal arson crimes charged in this case and there is little other way to interpret this as the necessity to establish both but for and proximate cause.

The Ninth Circuit has addressed proximate cause in related contexts, emphasizing that

5

proximate cause is generally presumed to be required when a statute involves a result-based offense unless Congress explicitly indicates otherwise. For instance,in *United States v. Pineda-Doval*, 614 F.3d 1019 (9th Cir. 2010), the court noted that proximate cause is presumed to be required for offenses involving a specific result, but this presumption can be rebutted if the statutory language or legislative intent suggests otherwise. *United States v. Pineda-Doval, 614 F.3d 1019 (9th Cir. 2010).*

*United States v. Main*, 113 F.3d 1046 (9th Cir. 1997), establishes that criminal law statutes infer proximate cause where an injury or death results from a defendant's conduct, even if the statute does not explicitly mention proximate cause.  This is precisely the situation here.  The substantial injury is billions of dollars in property damage.

Though the federal arson statutes do not explicitly mention proximate cause, they contain causal language and specify in the statutes injury resulting in the damage or destruction of property.  In this case, the "injury" is the billions of dollars worth of property damage the Government seeks to attribute to the Defendant for a fire he never set, but is alleged to have proximately caused.   Injury does not have to be physical injury or death and the injury here certainly will be emphasized throughout the trial by and through the Government's case in chief and front and center on the jury's mind in considering guilt or innocence.

As the Court in *United States v. Main* emphasized, proximate cause is a fundamental principle of criminal law, requiring that the defendant's conduct be both the actual cause ("but-for" cause) and the legal (or proximate) cause of the resulting harm. *United States v. Main*, 113 F.3d 1046 (9th Cir. 1997), *United States v. Pineda-Doval*, 614 F.3d 1019 (9th Cir. 2010).

*United States v. Pineda-Doval*, 614 F.3d 1019 (9th Cir. 2010), supports the proposition that proximate cause is a fundamental principle of criminal law and is inferred in statutes requiring a resulting injury or death.

Critically, the Ninth Circuit has also held that the absence of an express proximate-cause term in the statute does not eliminate the requirement. In the context of 18 U.S.C. § 1112 (manslaughter), the Ninth Circuit reasoned that it is "not relevant" that the statute does not expressly mention proximate cause, because the essential elements of the crime may be implicit

in the common understanding of the offense rather than fully enumerated in the statutory text. *United States v. Main*, 113 F.3d 1046 (9th Cir. 1997). That reasoning supports the broader proposition that statutory silence on proximate cause does not foreclose a proximate-cause element where the offense is defined in terms of conduct producing a specified result.

Because Ninth Circuit law treats proximate cause as part of criminal causation for result-based offenses and holds that proximate cause must be decided by the jury, the logical instructional consequence follows: when the statute contains causal language requiring a specified result (e. g. , "results from"), the jury should be instructed on proximate cause even if the statute does not expressly say "proximate cause." *United States v. Main*, 113 F.3d 1046 (9th Cir. 1997).

In *Paroline v. United States*, 572 U.S. 434 (2014) the Supreme Court emphasized that proximate cause serves to limit liability to those harms that are sufficiently **direct and foreseeable,** thereby excluding attenuated or remote consequences. The Court explained that proximate cause is often tied to foreseeability and the scope of the risk created by the defendant's conduct, ensuring that liability is not imposed for consequences that are mere fortuities. *Paroline v. United States*, 572 U.S. 434 (2014).

Under 18 U.S.C. § 844, which governs arson of property used in interstate or foreign commerce, the statute punishes the malicious damaging or destruction of property by fire, and the Government must therefore prove that the defendant's conduct was both the factual cause and the proximate cause of that damage or destruction. That requirement is consistent with the Ninth Circuit's causation principles. Proximate cause under (18 U.S.C. § 844(i) turns on whether the harm was a foreseeable result of the defendant's arson and whether any intervening act was an abnormal superseding cause. 18 U.S.C. § 844.

Similarly, 18 U.S.C. § 1855, which addresses fire-setting on federal lands, implicitly incorporates the same causation principles. Although § 1855 does not explicitly mention proximate cause, the Ninth Circuit has held that causation requirements are often implicit in criminal statutes. For example, in *United States v. Main*, 113 F.3d 1046 (9th Cir. 1997) the court noted that proximate cause is an essential element of crimes involving resulting harm, even when not expressly stated in the statute *United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000), *United*

7

*States v. Main*, 113 F.3d 1046 (9th Cir. 1997).

**C.  THE GOVERNMENT'S THEORY MAKES PROXIMATE CAUSE THE CENTRAL ISSUE IN THIS CASE**

The Defense's proximate-cause challenge proceeds on alternative theories. Primarily, the Government has the burden of proving this "holdover" fire theory and establishing that Palisades Fire was not independently caused — by an unknown ignition source distinct from the Lachman Fire — as the Government's own contemporaneous investigative conduct (discussed in Section I.D) reflects.   The Defense is prepared to address this case as one fire or two, but there should be no presumption of either. Such is the burden the Government has of establishing at trial through the evidence, and explaining its earlier inconsistent view with the theory now required to establish Federal Court jurisdiction.

Alternatively, and even assuming arguendo any causal nexus between the two fires, the intervening and superseding negligence of LAFD and California State Parks during the six-day interval breaks the chain of legal causation and is a question for the jury. *United States v. Main*, 113 F.3d 1046 (9th Cir. 1997).

. Either theory yields the same result: Mr. Rinderknecht did not proximately cause the Palisades Fire damages.

If facts and evidence result in the jury concluding that the Defendant is guilty of the Lachman Fire, but not guilty of the Palisades Fire, the indictment on §§ 844(i) and 1855 cannot stand.  In that outcome, the Defendant would have merely set fire to eight acres of brush on  state land that never burned federal property, or damaged and destroyed property affecting interstate commerce.

The indictment, the trial memorandum, and the Government's repeated public statements identify the *Palisades Fire*—the conflagration that began six days later—as the injury for which the Defendant must answer and more important, the injury for which they seek massive sentencing enhancements.  Any theory of conviction in this case requires the Government to bridge the six-day gap between two fires the Government, not the Defense, has named.  Addressing the potential intervening negligence at trial, and potential superseding negligence, would **not r**equire a mini-

trial of the Los Angeles Fire Department, or the California State Parks.  Proofs would merely address the following actions and if those actions, in the eyes of the jury, would break the chain of causation relative to the catastrophic property damage associated with the Palisades Fire.

LAFD declared the Lachman Fire suppressed and departed the scene;

*Firefighter Scott Pike testified at deposition that he warned commanders the fire was not extinguished—that there were active hot spots, audible crackling, and red-hot coals—and was overruled by Battalion Chief Mario Garcia, who ordered the hoses pulled;

*California State Parks Ranger Christy Araujo photographed a smoldering burn scar on January 1st at approximately 8:15am and took no further action;

*Captain Michael McIndoe warned Battalion Chief Mario Garcia that leaving the Lachman Burn Scar was not prudent given visible hot spots and incoming weather changes, but Garcia ordered hoses pulled anyway;

*No agency returned to monitor or extinguish the burn scar after the prediction of a catastrophic wind event less than 24 hours before the advent of the Palisades Fire.

These are textbook intervening and superseding causes and independent acts from the Defendant that should break the chain of causation.

The defense is entitled to an instruction that the jury must find beyond a reasonable doubt that the Defendant's act was both the but-for and the proximate cause of the property damage charged, and the property for which the Government seeks enhancements (i.e. The Palisades property damage). *See Mathews v. United States*, 485 U.S. 58, 63 (1988) (defendant entitled to instruction on theory of defense supported by evidence).

**D.  THE GOVERNMENT'S OWN CONTEMPORANEOUS INVESTIGATION TREATED THE PALISADES FIRE AS AN INDEPENDENT ARSON EVENT - NOT A HOLDOVER FROM THE LACHMAN FIRE**

The Government's holdover-fire theory of causation is a litigation construct retrofitted after the fact out of jurisdictional necessity.  The Government's own initial contemporaneous

investigative conduct—in the critical days and weeks after the Palisades Fire ignited—shows that no agency, including the ATF, treated the Palisades Fire as a holdover from the Lachman Fire. The two events were investigated, classified, and pursued as fundamentally different fires and the Palisades Fire was investigated as an arson, not deemed a "holdover fire."

The disparate treatment begins with the Lachman Fire itself. After the Lachman Fire, the LAFD Counter-Terrorism Section did not dispatch an arson investigative team to the Lachman Fire and in fact never did. Initially, no fire-cause investigation was initiated, no arson investigator was assigned and no crime scene evidence preservation protocol was invoked.

This undeniable reality was even one the Government itself acknowledged under oath. In the days and weeks following the January 1st, 2025 Lachman Fire, it was understood to have been caused by fireworks.

In its January 19, 2025 search warrant affidavit, the Government expressly represented that the Lachman Fire was likely caused by fireworks ignited by unknown persons on New Year's Eve.  That contemporaneous representation—made on the Government's own initiative, to a federal magistrate judge—is a binding admission that initially no agency treated the Defendant as the culpable ignition source until well after the Palisades Fire.

However, the Palisades Fire was treated in the opposite manner. From the outset, LAFD dispatched an arson investigative team to investigate the Palisades Fire as arson. Federal authorities did not  initially regard the Palisades Fire as a regrettable but foreseeable holdover from a small, fireworks-caused brush fire six days earlier occurring on state land, where no federal property was burned, but instead regarded it as a suspected arson committed by some person or persons unknown.

So certain were federal investigators that the Palisades Fire was a separate, independent act of arson, and not a continuous "holdover fire" from January 1st, that the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") obtained federal search warrants—issued by a federal magistrate judge upon sworn probable-cause showings—for individuals identified as suspects in the ignition of the Palisades Fire. Those warrants were executed. **(Ex. A - Search Warrant Palisades Arson Suspect).**

10

This contemporaneous investigative conduct is irreconcilable with the Government's present and necessary litigation theory. A "holdover" or "rekindle" fire is not investigated as a fresh arson event. A holdover fire does not generate sworn ATF probable-cause affidavits identifying new and unrelated arson suspects. A holdover fire does not result in executed federal search warrants on persons unconnected to the original ignition source six days earlier. Yet that is precisely what occurred here—and it occurred not as the product of defense speculation, but as the product of the Government's own sworn investigative judgments at the time. The fact they changed their mind to hail the Defendant into Federal Court and blame him for the Palisades Fire when their arson investigation ran dry, is for the jury to hear.

**II. ANY SENTENCING ENHANCEMENT TIED TO THE PROPERTY LOSS RESULTING FROM THE PALISADES FIRE REQUIRES THE GOVERNMENT TO PROVE BOTH BUT-FOR AND PROXIMATE CAUSATION UNDER BINDING NINTH CIRCUIT LAW**

The Government emphasizes it has not charged "death results" or "serious bodily injury results" enhancements under § 844(f)(2)–(3) or § 844(i). However, the Government's path to enhanced punishment in this case will therefore run almost entirely through the United States Sentencing Guidelines—and specifically through the loss-amount enhancement driven by the property damage attributed to the Palisades Fire, not the Lachman Fire, which is estimated to be in excess of $50 billion.

The Palisades Fire caused property losses measured in the billions. The Lachman Fire, standing alone—eight acres of state-park brush—caused virtually none. If the Government is to seek any meaningful upward adjustment beyond the base offense levels of §§ 844(f)(1), 844(i), and 1855, it will be by importing the Palisades Fire loss figures into the Guidelines calculation under USSG § 2K1.4 and its cross-references to § 2B1.1.

The Ninth Circuit has been unmistakably clear: the Government cannot import a Guidelines loss amount into a defendant's sentence without proving both but-for and proximate causation. Mr. Rinderknecht's exposure to a Guidelines loss enhancement therefore turns on the same causal question presented by the substantive elements of the charged offenses: whether his

11

alleged ignition of the Lachman Fire was the legal cause of the Palisades Fire damages—or whether the LAFD's and California State Parks's six-day failures broke the chain of causation.

**A. THE NINTH CIRCUIT HAS CONSISTENTLY REQUIRED BOTH BUT-FOR AND PROXIMATE CAUSATION TO ESTABLISH LOSS AMOUNTS FOR SENTENCING**

In *United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000), the Ninth Circuit held that the sentencing guidelines' "relevant conduct" provision requires a defendant's sentence to be based on **all harm that resulted from the acts or omissions of the defendant**. U.S. Sentencing Guidelines Manual § 1B1.3(a)(3). *United States v. Hicks*, 217 F.3d 1038, 1041. Specifically, the court held that the government must demonstrate both but-for causation **and proximate causation** to establish the loss amount for sentencing enhancements. Therefore, even where the statute is silent on causation. The Ninth Circuit in *Hicks* explicitly opined that the Sentencing Guidelines' "relevant conduct" provision under U.S.S.G. § 1B1.3(a)(3) requires the government to establish both but-for causation and proximate causation to determine the loss amount for sentencing purposes. *United States v. Hicks*, 217 F.3d 1038 (9th Cir. 2000).

Similarly, in *United States v. Berger,* 587 F.3d 1038, 1043, the court quoted "In *Hicks*, we stated that "[t]he Guidelines' 'relevant conduct' provision requires a defendant's sentence to be based on 'all harm that resulted from the acts or omissions' of the defendant." *Id*. (quoting U.S.S.G. § 1B1.3(a)(3) (1995)); *id*. at 1048-49 (holding that the government must show both "but-for" and "proximate" causation in establishing loss)." *United States v. Berger*, 587 F.3d 1038, 1043.

The Ninth Circuit court case of *United States v. George,* 949 F.3d 1181, 1187 took it one step further quoting "the government suggests that section 2B1.1(b)(2) does not require foreseeability, but proximate cause is a well-established [**11]  principle of the common-law, and we presume that the Sentencing Commission did not mean to dispense with it without saying so."; *Hicks*, 217 F.3d at 1049. *United States v. George*, 949 F.3d 1181, 1187.

The *Hicks/Berger/George* line is controlling in this Circuit and dispositive here. If the Government intends to seek a Guidelines loss-amount enhancement based on the Palisades Fire damages, it must establish that the Defendant's acts were both the but-for cause and the proximate cause of those damages and present such evidence before the jury. It cannot evade that causation

12

requirement by proclaiming it declined to charge death-results or injury-results enhancements—because the Guidelines loss-amount framework imposes the precise same causal requirement independently of the charged enhancements.

There exists no contrary argument that the Ninth Circuit authority clearly establishes that for sentencing enhancements based on loss amounts under federal statutes, including arson-related offenses, the government must prove both but-for and proximate causation between the defendant's conduct and the loss amount . *United States v. Hicks,* 217 F.3d 1038 (9th Cir. 2000), *United States v. Berger*, 587 F.3d 1038 (9th Cir. 2009), *United States v. George,* 949 F.3d 1181 (9th Cir. 2020), *United States v. Warr*, 530 F.3d 1152 (9th Cir. 2008). This requirement ensures that only foreseeable and direct harms are attributed to the defendant for sentencing purposes and in this case requires such proof for the causal damage associated with both the Lachman and the Palisades Fires.

Thus, for the Government to seek a sentencing enhancement based on damages caused by the Palisades Fire, it must establish; 1) The Defendant intentionally and maliciously started the Lachman Fire; 2) A causal nexus that the Palisades Fire would not have occurred but for the Defendant setting the Lachman Fire; 3) The Defendant by starting the Lachman Fire proximately caused the damage resulting from the Palisades Fire and 4) No intervening agency negligence between the dates of January 2nd, 2025 and January 7th 2025 broke that chain of causation

These four potential outcomes do not offer the straight line path the Government seeks, but are what is constitutionally required for the Defendant to get a fair trial, and all questions for the jury that would necessitate Special Jury Instructions presenting the burden of proof the Government must meet to secure a conviction.

**III.  THE § 844(i) INTERSTATE-COMMERCE NEXUS AND THE § 1855 FEDERAL-LAND REQUIREMENT ARE ELEMENTS THE GOVERNMENT MUST PROVE TO THE JURY**

During meet and confer, the Government proclaimed "we all agree this is one fire."  No we do not.  Unless the attorneys reach a fact stipulation to the more direct path of conviction (i.e. one fire), the only belief that matters is the jury's belief after they hear all the evidence.  The

premise that Palisades Fire was a holdover fire from the Lachman Fire needs to be proved at trial. (See Section I:D and the Government's inconsistent history of what caused the Palisades Fire).

The Government is well aware that the federal reach of two of these charges rests entirely on the Palisades Fire, and its federal property damage, and this is why the Government switched horses in the race to promote the presumptive holdover theory.  They need to prove it.

What results is a plethora of considerations for the jury and each one should be an option for the jury when making a decision if a young man is going to spend most of the rest of his life in prison.

These are questions of proof, not of the Court's power to hear the case. The Court's subject-matter jurisdiction over this prosecution is secure: 18 U.S.C. § 3231 vests the district courts with original jurisdiction over all offenses against the laws of the United States, and that jurisdiction attaches once a federal offense is charged. The interstate-commerce requirement of § 844(i) and the federal-land requirement of § 1855 are sometimes described as the statutes' jurisdictional elements, but however they are labeled, they are elements of the offenses — facts the Government must prove to the jury beyond a reasonable doubt. *See United States v. Geiger*, 263 F.3d 1034 (9th Cir. 2001) (the § 844(i) commerce nexus must be proved to the jury beyond a reasonable doubt).  The consequence is straightforward: if the jury finds the Defendant responsible for the Lachman Fire but is not persuaded that he caused the Palisades Fire, the Government will have failed to prove a necessary element of Counts Two and Three, and the jury must return verdicts of not guilty on those counts.

**A.  COUNT THREE (§ 1855) FAILS BECAUSE THE LACHMAN FIRE WAS ALLEGEDLY SET ON NON-FEDERAL LAND AND DID NOT DAMAGE OR DESTROY ANY FEDERAL PROPERTY**

Section 1855 is a Property Clause statute. *See* U.S. Const. art. IV, § 3, cl. 2. Its statutory reach is precisely co-extensive with federal **ownership, lease, or jurisdiction** of the land where the fire is set:

> Whoever, willfully and without authority, sets on fire any timber, underbrush, or grass or other inflammable material **upon the public domain or upon any lands**

14

**owned or leased by or under the partial, concurrent, or exclusive jurisdiction**

**of the United States** . . . shall be fined under this title or imprisoned not more

The closest factual analogue to this case is *United States v. Grant*, 318 F. Supp. 2d 1042 (D. Mont. 2004) (Molloy, J.).  In *Grant*, the defendant set fires on state lands, none of which were federally owned or under federal jurisdiction. Although the fires were near federal land and posed a threat to it, the court emphasized that the statute does not extend to conduct on non-federal lands, even if such conduct endangers federal property.

*Grant* confirms that § 1855 does not reach a fire set on land that is not federally owned, leased, or under federal jurisdiction. The Lachman Fire, standing alone, was an eight-acre vegetation fire ignited on state park land that burned no federal property. The location of the fire on land owned, leased, or controlled by the United States is an element of the § 1855 offense, and on the stand-alone Lachman Fire the Government cannot prove it. The jury must therefore acquit on Count Three.

**B.  COUNT TWO (§ 844(i)) ALSO FAILS BECAUSE EIGHT ACRES OF STATE-PARK BRUSH IS NOT "PROPERTY USED IN INTERSTATE COMMERCE."**

For the same reason the § 1855 charge cannot be proven on the stand-alone Lachman Fire, the § 844(i) charge fares no better—and on analogous reasoning.

Section 844(i) reaches a defendant who "maliciously damages or destroys . . . any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." 18 U.S.C. § 844(i).

The Ninth Circuit has insisted on a genuine commercial nexus, and the Supreme Court has read § 844(i) the same way. In *Jones v. United States*, 529 U.S. 848 (2000), the Court held that § 844(i) does not reach an owner-occupied residence not used in any trade or business. And in *United States v. Pappadopoulos*, 64 F.3d 522, 526–27 (9th Cir. 1995), the Ninth Circuit reversed a § 844(i) conviction where a private home's only link to interstate commerce was an out-of-state natural gas supply — a connection the court held far too attenuated to support federal prosecution. The brush burned in the Lachman Fire has no commercial nexus at all.

Brush with no commercial nexus does not satisfy the interstate-commerce element of §

15

844(i). The Ninth Circuit has consistently interpreted the statute to require an active and substantial connection to interstate commerce; non-commercial activity such as the burning of brush does not qualify unless the property was itself employed in commerce or otherwise directly affected interstate commerce. The element reaches only property actively employed for commercial purposes, and attenuated or incidental connections to commerce are insufficient. *United States v. Pappadopoulos*, 64 F.3d 522 (9th Cir. 1995); *United States v. Geiger*, 263 F.3d 1034 (9th Cir. 2001).

The Government's ability to prove the § 844(i) interstate-commerce element, like its ability to prove the § 1855 federal-land element, depends on the Palisades Fire footprint — which included commercial structures, supply chains, utilities, and other property genuinely used in commerce. If the jury finds that the Defendant did not proximately cause the Palisades Fire, the § 844(i) count rests on eight acres of brush, and the Government cannot prove the interstate-commerce element beyond a reasonable doubt.

*C.* **THE COURT SHOULD ADOPT A SET OF SPECIAL JURY INSTRUCTIONS ADDRESSING THE POSSIBLE FACTUAL OUTCOMES THE JURY MAY REACH**

The decision to use a special verdict form lies within the discretion of the trial court. Courts review such decisions for abuse of discretion, considering whether the instructions and verdict forms adequately address the issues presented at trial . *United States v. Reed*, 147 F.3d 1178 (9th Cir. 1998).

In *Reed*, the court found that the special verdict form was appropriate because it required the jury to determine the occurrence of specific acts, each sufficient to support the conviction, without coercing the jury or altering the elements of the crime. *United States v. Reed*, 147 F.3d 1178 (9th Cir. 1998).

Therefore to assure the jury weighs all factual possibilities in the administration of justice, the Defense will request special jury instructions and/or a special verdict form requiring the jury to answer separately:

Do you find Mr. Rinderknecht maliciously set the January 1st, 2025 Lachman Fire?

If yes, do you find that but for the Lachman Fire, the Palisades Fire would not have occurred?

If yes, did Mr. Rinderknecht's charged act of setting the Lachman Fire proximately cause the Palisades Fire?

If yes, do you find any negligence acts of third parties breaks the chain of causation between the Defendant's conduct and the resulting injury caused by the Palisades Fire.

This seems appropriate here, where the federal elements of Counts Two and Three turn on contested factual findings — whether the Defendant caused the Palisades Fire and the federal and commercial property damage within its footprint. Separating those findings ensures that any possible conviction on Counts Two and Three rests on proof of every element beyond a reasonable doubt, and that the jury is not invited to assume the federal element from a finding limited to the Lachman Fire. The Defense is prepared to present such instructions upon the Court's consideration.

**IV.  CONCLUSION**

This Court should:

Instruct the jury that proximate cause is an element of each substantive count;

Instruct the jury on the doctrine of superseding cause, with reference to the conduct of LAFD and California State Parks during the six-day interval;

Submit a special verdict form requiring separate findings on each link in the causal chain; and

Recognize that, upon a possible verdict finding Mr. Rinderknecht responsible for the Lachman Fire but not the Palisades Fire, the Government will have failed to prove the federal elements of Counts Two and Three — requiring verdicts of not guilty on those counts — and that any loss attributable to him in Count One - Destruction of Property by Means of Fire (18 U.S.C. § 844(f)(1)), is limited to the non-federal property damage of the Lachman Fire.

Respectfully submitted,

HANEY LAW GROUP, PLLC

/s/ Steven A. Haney, Sr.
STEVEN A. HANEY, SR. (P63947)
Attorney for Defendant

17

JONATHAN RINDERKNECHT

18

# EXHIBIT A

UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

January 15, 2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CLD_ DEPUTY

In the Matter of the Search of:
Information associated with the TikTok username "freestyle.philosopher" that is within the possession, custody, or control of TikTok Inc.

)
)
)
)
)
)
)

Case No. 2:25-MJ-00151

**APPLICATION FOR WARRANT BY TELEPHONE PURSUANT TO 18 U.S.C. § 2703**

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. §§ 1855; 844(i) | Timber Set Afire; Arson Involving Property Used In or Affecting Interstate or Foreign Commerce |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

*/s/*
Applicant's signature

SA Michael Montevidoni, Special Agent, ATF
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 15, 2025

Judge's signature

City and State: Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
Printed name and title

AUSA: Danbee Kim, x6530

USAO_00045212

**ATTACHMENT A**

PROPERTY TO BE SEARCHED

    This warrant applies to information that is associated with the SUBJECT ACCOUNT identified as **"freestyle.philosopher"** that is within the possession, custody, or control of TikTok Inc., a company headquartered at 5800 Bristol Parkway, Suite 100, Culver City, California, 90230, regardless of where such information is stored, held, or maintained.

USAO_00045213

**ATTACHMENT B**

ITEMS TO BE SEIZED

I. SEARCH PROCEDURES

1.    The warrant will be presented to personnel of TikTok Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and

30

USAO_00045214

"FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

6.   The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant.  The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7.   Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court.  Thereafter, the search team will not access the data

31

USAO_00045215

from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.    To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.    All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT between January 6, 2024 and the date of this warrant,[5] including:

---

[5] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

32

USAO_00045216

i. All emails, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, draft messages, cached or deleted messages, messages maintained in trash or any other folders or tags or labels, "likes," chats, reaction videos, direct messages, as well as all header information associated with each email or message (including the source and destination addresses and actual Internet Protocol ("IP") addresses of the sender and recipients of the emails; the date and time at which each communication was sent, and the size and length of the each communication), and any related documents or attachments;

ii. All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files;

iii. All data and information associated with the profile page of the SUBJECT ACCOUNT, including photographs, "bios," and profile backgrounds and themes;

iv. All communications or other messages sent or received by the SUBJECT ACCOUNT;

v. All preserved, stored, cached, or deleted user content created, uploaded, saved, shared, liked, commented on, or reacted to by the SUBJECT ACCOUNT, including Exchangeable

33

USAO_00045217

Image File ("EXIF") data and any other metadata associated with those videos;

> vi.  All preserved, stored, cached, or deleted photographs, videos, images, comments, captions, and hashtags, as well as any metadata associated therewith, in the user gallery for the SUBJECT ACCOUNT;

> vii. All location data associated with the SUBJECT ACCOUNT, or with photographs, videos, or other content, including geotags;

> viii.    All records of TikTok searches performed by the SUBJECT ACCOUNT, including all past searches saved by the SUBJECT ACCOUNT;

> ix.  A list of all of the people that the user of the SUBJECT ACCOUNT follows on TikTok and all people who are following the user (i.e., the user's "following" list and "followers" list), as well as any "friends" of the user;

> x.   A list of all users that the SUBJECT ACCOUNT has "unfollowed" or blocked;

> xi.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

> b.   All other records and information between January 6, 2024 and the date of this warrant,[6] including:

---

[6] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction

34

USAO_00045218

i.    All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or email addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, account status, cookies, connected applications and sites, methods of connecting, log files as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary email accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)   the SUBJECT ACCOUNT.

(II)  recovery/secondary accounts or accounts linked by cookies.

---

(for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

35

USAO_00045219

ii. All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dialups, and locations, and including specifically the specific product name or service to which the connection was made.

iii. Any other account associated with the SUBJECT ACCOUNT, including by means of sharing a common secondary, recovery, or alternate email address listed in subscriber records for the SUBJECT ACCOUNT or by means of sharing a common phone number or SMS number listed in subscriber records for the SUBJECT ACCOUNT, or linked by IP address, machine cookie, or other unique device or user identifier, and any account that lists the SUBJECT ACCOUNT as a secondary, recovery, or alternate email address.

iv. Any information identifying the device or devices used to access the SUBJECT ACCOUNT, including any Android ID, Advertising ID, unique application number, hardware model, operating system version, unique device identifier, Global Unique Identifier or "GUID," serial number, mobile network information, phone number, device serial number, MAC address, Electronic Serial Number ("ESN"), Mobile Electronic

36

USAO_00045220

Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Number ("MIN"), Subscriber Identity Module ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifier ("IMSI"), International Mobile Equipment Identity ("IMEI"), or Apple advertiser ID or ID for advertisers ("IDFA") or Google's AAID or any other advertiser ID, and any other information regarding the types of devices used to access the SUBJECT ACCOUNT or other device-specific information, including the device type, brand name, device mode or operating system, and first and last times that a device were observed.

v.     All records pertaining to communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken, and information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

c.     Any information showing the location data of the user of the SUBJECT ACCOUNT between January 6, 2024 and the date

37

USAO_00045221

of this warrant[7], including while sending or receiving a message using the SUBJECT ACCOUNT or accessing or logged into the SUBJECT ACCOUNT, whether derived from Global Positioning System (GPS) data, cell site/cell tower triangulation/trilateration, precision measurement information such as timing advance or per call measurement data, Wi-Fi locations, IP addresses, browsing history, advertising data, or metadata of images and videos, and SSIDs and MAC addresses for all WiFi access points that have been detected by or connected to devices associated with the account.  Such data shall include the GPS coordinates and the dates and times of all location recordings when available to PROVIDER.

## III.  INFORMATION TO BE SEIZED BY THE GOVERNMENT

11.  For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.    All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, §§ 1855 (Timber Set Afire) and 844(i) (Arson Affecting Interstate or Foreign Commerce) (the "SUBJECT OFFENSES") from January 6, 2025 to date of this warrant namely:

---

[7] To the extent it is not reasonably feasible for the PROVIDER to restrict any categories of records based on this date restriction (for example, because a date filter is not available for such data), the PROVIDER shall disclose those records in its possession at the time the warrant is served upon it.

38

USAO_00045222

i.    Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.   Information related to how and when the SUBJECT ACCOUNT was accessed or used;

iii.  Information relating to persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the SUBJECT OFFENSES; or (ii) communicated with the Account about matters relating to the SUBJECT OFFENSES and/or the wildfire in the Pacific Palisades area, including records that help reveal their identities and whereabouts;

iv.   Information relating to how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the SUBJECT OFFENSES and/or the wildfire in the Pacific Palisades area and to the Account user;

v.    Records, documents, photographs, video recordings, programs, applications, materials, communications, messages and posts, or information relating to the SUBJECT OFFENSES and/or the wildfire in the Pacific Palisades area;

b.    All records and information described above in Section II.10.b.

39

USAO_00045223

## IV.  **PROVIDER PROCEDURES**

12.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 2 days of the service of this warrant.  The PROVIDER shall send such information to:

> Special Agent Michael Montevidoni
> Bureau of Alcohol, Tobacco, Firearms and Explosives
> 555 N. Brand Blvd #800, Glendale, CA 91203
> 915-255-8713
> Michael.montevidoni@atf.gov

13.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.  IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States. Upon expiration of this order, at least ten business days prior to disclosing the existence of the warrant, the PROVIDER shall notify the agent identified in paragraph 12 above of its intent to so notify.

40

USAO_00045224

**AFFIDAVIT**

I, Michael A. Montevidoni, being first duly sworn, hereby depose and state as follows:

**I.    INTRODUCTION**

1.    I am Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). I have been a Special Agent with ATF since July 2015.  As a Special Agent with ATF, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law.  I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. See 18 U.S.C. § 3051.

2.    As an ATF Special Agent, I have completed the Criminal Investigator Training Program and ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in the investigation of federal crimes involving firearms, narcotics, arson and explosives.  My experience as a Special Agent with the ATF includes, but is not limited to, conducting physical surveillance, interviewing witnesses and subjects, executing search and arrest warrants, and obtaining and analyzing digital and social media content and communications.  I am currently

1

USAO_00045225

assigned to the ATF Los Angeles Division - Arson and Explosives Group, and am primarily responsible for the investigation of arson and explosive incidents. I have participated in numerous arrest and seizure warrants involving a variety of offenses, including violations pertaining to arson and explosives. I have personally reviewed reports and documentation, observed scene photographs and have had conversations with employees at the ATF and other law enforcement agencies in regard to the offenses referred to below. I am familiar with the facts and circumstances of this investigation.

3. I make this affidavit in support of an application for a search warrant for information associated with the account identified as "freestyle.philosopher" (the "SUBJECT ACCOUNT"), believed to be used by B[REDACTED] O[R], that is stored at premises controlled by TikTok Inc. (the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 5800 Bristol Parkway, Suite 100, Culver City, CA 90230 United States.[1] The information to be searched is

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of

USAO_00045226

described herein and in Attachment A.  This affidavit is made in

support of an application for a warrant under 18 U.S.C.

§§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require

the PROVIDER to disclose to the government copies of the

information (including the content of communications) described

in Section II of Attachment B.  Upon receipt of the information

described in Section II of Attachment B, law enforcement agents

and/or individuals assisting law enforcement and acting at their

direction will review that information to locate the items

---

the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

3

USAO_00045227

described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

4.   As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence, contraband, fruits, or instrumentalities of criminal violations of Title 18, United States Code, §§ 1855 (Timber Set Afire) and 844(i) (Arson Involving Property Used In Or Affecting Interstate or Foreign Commerce) (the "SUBJECT OFFENSES"). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

5.   The facts set forth in this affidavit are based upon my personal observation, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probably cause for the requested warrant and does not purport to set forth all my knowledge of the investigation into this matter.  Unless specifically indicated otherwise, all statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

4

USAO_00045228

## II.   <u>**SUMMARY OF PROBABLE CAUSE**</u>

6.   Beginning January 7, 2025 and ongoing, a large wildfire (the "Palisades Fire") consumed the Pacific Palisades area and burned thousands of structures, including residences and commercial buildings used in or affecting interstate commerce, as well as Federal land, such as the land off of Las Flores Canyon and the Backbone Trail in the Santa Monica Mountains National Recreational Area.  ATF Certified Fire Investigators ("CFIs") and Special Agents determined the origin of the fire and through their investigation, excluded environmental, electrical, and utility factors as a cause of the fire.  Instead, ATF CFIs and Special Agents suspect, based on the facts detailed below, that human intervention was the cause of the Palisades Fire.

7.   On or about January 7, 2025, a TikTok user by the username "freestyle.philosopher" (the "SUBJECT ACCOUNT") posted a video showing five male individuals on the Temescal Ridge Trail very shortly (perhaps minutes) after the Palisades fire ignited and very close to the location where the fire first ignited.  Comments on the post indicate that the SUBJECT ACCOUNT had posted other relevant content, including a video and comment that have since been deleted. The commenters suggest that the

5

USAO_00045229

SUBJECT ACCOUNT holder and/or the other people depicted in the video may have started the fire.

8.   The proposed warrant seeks information from the SUBJECT ACCOUNT by which to identify additional evidence regarding the origin and cause of the Palisades fire and evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

9.   Based on my personal participation in the investigation into the Palisades Fire, my conversations with federal, state, and local law enforcement partners also involved in the investigation, and my review of related records, I know the following:

A. <u>The Palisades Fire Was Likely Caused By Human Intervention</u>

10.   On or about January 7, 2025, a fire broke out in the Pacific Palisades area in Southern California.  The Palisades Fire has burned through approximately 23,000 acres and has burned approximately 5,000 structures, to include residences and commercial businesses.  Currently, the Palisades Fire has resulted in the deaths of at least eight individuals.

11.   ATF along with state and local law enforcement agencies are investigating the origin and cause of the Palisades Fire.  During the course of the investigation thus far, ATF Certified Fire Investigators ("CFIs") and Special Agents: (1)

6

USAO_00045230

interviewed residents of homes in close proximity to areas believed to be the origin; (2) observed photographs of the initial plume of smoke taken by said residents; (3) reviewed the originating 911 calls; (4) observed video recordings capturing the initial plume of smoke; and (5) physically examined suspected origin locations. ATF CFIs and Special Agents determined that the origin area of the Palisades Fire on January 7, 2025, is within the areas of the Temescal Ridge Trail.

12. The relevant areas of the Temescal Ridge Trail are mountainous, natural landscapes with multiple hiking trails and multiple trailheads to enter or exit the area. ATF CFIs physically observed the relevant areas during the investigation. ATF CFIs and ATF's National Response Team ("NRT"), which consists of subject matter experts in the field of fire investigations and the determinations of the origin and cause of fires and wildfires, determined that the cause of the Palisades Fire excludes environment and electrical or utility factors. The ATF CFIs determined through a query of the World Wide Lightning Network that no lightning strikes occurred between January 1 and 7, 2025 for the relevant areas of the Temescal Ridge Trail. Further, after physical observation of the suspected area of origin, it was determined that there are no power lines, power cables or other utility equipment in the

7

USAO_00045231

vicinity that could have caused the fire.  Due to these factors and based on their training and experience and the information they received from a tipster (described in further detail below), ATF CFIs suspect that human intervention was the cause of the Palisades Fire.[3]

B. <u>Summary of the Investigation To Date</u>

13.  On January 7, 2025, at approximately 10:29 a.m., the resident of the property located on Piedra Morada Drive, Pacific Palisades, CA, whose house is approximately 2,500 feet away from the relevant portions of the Temescal Ridge Trail, called 911 to report a fire.  This is the earliest information regarding the start of the Palisades Fire known to law enforcement.  The individual took a photograph of a plume of smoke, which is in the same area as the Temescal Ridge Trail and provided that photograph to law enforcement.

14.  On January 8, 2025, Los Angeles Regional Crime Stoppers received an anonymous tip in reference to the Palisades Fire.  The tipster stated that they had come across a video on social media, later identified as the social media platform TikTok, that could be of help to law enforcement.  The tipster

---

[3] The investigative team is also investigating whether the Palisades Fire was caused by the reignition of an earlier fire nearby, which is believed at this time to have been caused by fireworks on New Year's Eve. (Based on their training and experience, ATF CFIs understand that previous wildfires can reignite after weeks after they have been extinguished, particularly during high wind events.)

8

USAO_00045232

provided a link to the video.  The tipster also stated that, in the comments section of the video, the individuals who were filmed in the video stated that they heard a noise around the time they saw smoke.

15.  On January 8, 2025, Los Angeles Fire Department investigators received this information from the Los Angeles Regional Crime Stoppers and recorded the TikTok video for preservation purposes and photographed the comments of the video.  The TikTok user displaying the username "freestyle.philosopher" (the "SUBJECT ACCOUNT") posted the TikTok video.

16.  In the recording of the TikTok video, five males are in or near the area of the Temescal Ridge Trail, where a smoke plume is recorded and an individual states that they are in a fire.  Throughout the course of the video, the recording shows a plume of smoke on multiple occurrences, similar in appearance to the plume of smoke depicted in the photograph taken by the resident who called 911 on January 7, 2025, at approximately 10:29 a.m.  The video recording appears to be from around the same time based on the sun being out and the similar size and shape of the plume of smoke. In the recording, the five males run past multiple rock formations, which are similar in

9

USAO_00045233

appearance to the rock structures located at the Temescal Ridge Trail.

17. As illustrated below, in the comments section of the TikTok video, a TikTok user with the username "flowstylezfpv" stated that SUBJECT ACCOUNT (1) had posted another video prior to posting the TikTok video but had since deleted it, and (2) had posted about a comment and had since deleted it. Another user, with the username "Check Point," in response to the comment made by username "flowstylezfpv" stated that they observed the same thing and saved the videos. Another TikTok user with the username "AK_chilltok" stated that there was another video that "they," in an apparent reference to the individuals in the TikTok video or the SUBJECT ACCOUNT, deleted, which according to "AK_chilltok," made it look like "they" started the fire and that the replies  in the comments of that now-deleted post "did not help." These comments are pictured below:

10

USAO_00045234

**flowstylezFPV**

He had posted another video prior to this one and he deleted it. He also posted about a comment and also deleted it. Super sketch @LAPD

13h ago    Reply                                    1

**Check Point**

I saw that and saved the videos

12h ago    Reply                                    1

**ayalovewatermelonsssss**

can't be ... you can't trespass palisades love they have too security these are million dollars houses homes we talking about lol. but it's definitely planned you just got to wake up maui was a test..

12h ago    Reply                                    0

**summerisover**

Why are they your friend?

11h ago    Reply                                    0

**Check Point**

That's actually a huge part of the reason I stopped hanging out with him and this was 15 years ago and he OD'd 3 years ago

11h ago    Reply                                    0

**AK_chilltok**

there was another video they took down that definitely made it look like they started it, and the replies to comments didnt help

10h ago    Reply                                    0

**Check Point**

I saw that too, they also replied and said "it wasn't us it was UFO's." honestly I think they're cooked

                                                  2

Back to top ⌃

18.  The Palisades Fire burned areas of federal land, such as the land off of Las Flores Canyon and the Backbone Trail in the Santa Monica Mountains National Recreational Area, which are not far from the relevant portions of the Temescal Ridge Trail. In addition, while this investigation is still in its early stages, I believe that the Palisades Fire affected numerous

11

USAO_00045235

buildings, vehicles, and other real and personal property used in interstate commerce and in activities affecting interstate commerce. For example, the fire reached (and crossed) the Pacific Coast Highway ("PCH"), regularly used by vehicles in interstate commerce, and destroyed at least one well-known restaurant on the PCH. And the PCH has been closed to the public as a result of the fire. In addition, firefighters and first responders from outside of the State of California have responded to help contain and control the spread of the fire.

19. On January 15, 2025, investigators received subscriber information for the SUBJECT ACCOUNT from TikTok in response to legal process and the account appears to belong to an individual, B.O., who is a resident of Los Angeles.

20. To my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

IV. **SERVICES PROVIDED BY TIKTOK**

21. PROVIDER is the provider of the internet-based account identified as the SUBJECT ACCOUNT.

22. PROVIDER owns and operates TikTok, a free access social media platform accessed through a software application ("app") downloaded to a user's device. The TikTok app allows users to create and share short-form videos and to interact with other TikTok users. Videos created through the TikTok app are

12

USAO_00045236

limited to approximately three to fifteen seconds, although users can compile several videos into a sixty-second video loop. Users are able to create draft videos to edit before publishing them on TikTok, and can also save videos to their device to view offline and share with others outside the TikTok app.  Users can also save to their profile favorite videos, hashtags, filters, and sounds, such as music clips, in order to easily access those items in the future.

23.  A TikTok user may set their account to be public or private.  The user can also control privacy settings for individual videos to make them public, private, or accessible by "friends only."  If a user has a public account, all public videos can be viewed by other TikTok users.  However, if a TikTok user has a private account, only the user's followers can view their "public" videos.  TikTok users can find and view videos through two different video "feeds" offered in the app. The first feed, "For You," comprises a selection of videos recommended for the user by PROVIDER based on the user's past interactions on TikTok and PROVIDER'S proprietary algorithm.  A second feed comprises videos published by other TikTok accounts that the user has chosen to follow.

24.  PROVIDER enables users to interact with each other through the app.  For example, when a user views a video on

13

USAO_00045237

TikTok, the user can "like" a video by selecting a heart icon on the video or, alternatively, can indicate that they are "not interested." Users can comment on, share, or post a reaction video to another user's video. TikTok users can also create "duet videos," which are the user's own video played simultaneously in a split screen with another public TikTok video.

25. When a user creates a TikTok account, PROVIDER will collect certain data provided during registration, which may include first and last name, phone number, device model, and email address. PROVIDER retains the account creation date, the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular log-ins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

14

USAO_00045238

26.    In addition to IP logs, PROVIDER stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access TikTok.  PROVIDER may also collect data related to a user's browsing history, mobile carrier, time zone, and machine cookies.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used by providers such as PROVIDER may constitute evidence of the criminal activity under investigation.  By linking various accounts, devices, and online activity to the same user or users, cookies and linked

15

USAO_00045239

information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

27. PROVIDER collects location information about a user, including information derived from IP addresses used to access TikTok, a user's SIM card and mobile carrier, and, depending on a user's privacy settings, Global Positioning System ("GPS") data.

28. PROVIDER may collect information related to the contacts stored on a user's device when the user has granted access, as well as information from third-party social media accounts that a user has linked to their TikTok account.

29. In addition to video content, PROVIDER collects information related to a user's profile, setting, and communications with other TikTok users, including comments, direct messages, and live chats. PROVIDER records and retains information associated with these communications that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a communication. Additionally, PROVIDER collects certain metadata that is connected to content uploaded to TikTok by the user. That metadata can include information related to how, when, and by whom the piece of content was collected and how that content is formatted. It

16

USAO_00045240

also includes information, such as an account name, that enables other users to trace the content back to a specific TikTok account.

30. In my training and experience, TikTok retains deleted data for a period of seven days or more, which is stored in cached data files maintained by TikTok. It was determined by law enforcement during the course of the investigation that potential evidence was deleted by the TikTok user account "freestyle.philosopher".

31. Preservation orders were served on January 13 ,2025 which TikTok has confirmed receipt and preservation of the requested data.

32. In my training and experience, email and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of emails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the

17

USAO_00045241

crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

33. As explained herein, information stored in connection with a TikTok account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating officials to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a TikTok account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, sent and received communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the online service provider can show how and when the account was accessed or used. For example, providers typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the criminal activity under investigation.

18

USAO_00045242

Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video uploaded).  Finally, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation.  For example, information in an account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[4]

**V.    BACKGROUND ON EMAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER**

34.  In my training and experience, I have learned that providers of email and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information

---

[4] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant.  Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

USAO_00045243

when registering for an email or social media account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

35. Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, email or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

36. A subscriber of the PROVIDER can also store with the PROVIDER files in addition to emails or other messages, such as address books, contact or buddy lists, groups, social network

20

USAO_00045244

links, calendar data, pictures or videos (other than ones attached to emails), notes, and other files, on servers maintained and/or owned by the PROVIDER.  In my training and experience, evidence of who was using an account may be found in such information.

37.  In my training and experience, email and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the data on which the account was created, the length of service, records of login (i.e., session times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, email and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a SUBJECT ACCOUNT.

USAO_00045245

38. In my training and experience, email and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of emails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT

## VI. BACKGROUND ON THE SEIZURE OF DIGITAL EVIDENCE FROM THE PROVIDER

39. I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time. Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to

22

USAO_00045246

show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of a SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with a SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

40. Relatedly, the government must be allowed to determine whether other individuals had access to a SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the

23

USAO_00045247

misleading impression that only a single user had access to the account.

41.  I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

42.  This application seeks a warrant to search all responsive records and information under the control of the

USAO_00045248

PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

43. As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a. I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b. I also know from my training and experience that many accounts are purged as part of the ordinary course of

USAO_00045249

business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VII.  **REQUEST FOR NON-DISCLOSURE**

44.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court or until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; or (4)

26

USAO_00045250

otherwise seriously jeopardizing the investigation. The criminal investigation set forth is not public, and I know, based on my training and experience, that the premature public disclosure of an ongoing investigation such as this one may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution. For example, if a person involved in the ignition of the Palisades Fire were to learn of this warrant, the person might permanently delete incriminating video footage or photographs or communications relating to the ignition and/or encourage associates to do the same.

## VIII. **CONCLUSION**

45. Based on the foregoing, I request that the Court issue the requested warrant. The government will execute this warrant by serving the warrant on the PROVIDER. Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

46. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.

27

USAO_00045251

These documents discuss an ongoing criminal investigation that is neither public nor known to the potential targets and subjects of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

/s/ Michael A. Montevidoni
Michael A. Montevidoni,
Special Agent, Bureau of
Alcohol, Tobacco, Firearms,
and Explosives (ATF)

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __15th__ day of January, 2025.

Type text here

HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

28

USAO_00045252